*6
 
 Opinion
 

 GEORGE, C. J.
 

 In this case we consider whether appellant Susann (known as Sun) Margreth Bonds voluntarily entered into a premarital agreement with respondent Barry Lamar Bonds. We conclude that the Court of Appeal erred in determining that because Sun, unlike Barry, was not represented by independent counsel when she entered into the agreement, the voluntariness of the agreement must be subjected to strict scrutiny. Instead, we determine that the circumstance that one of the parties was not represented by independent counsel is only one of several factors that must be considered in determining whether a premarital agreement was entered into voluntarily. Further, as we shall explain, we conclude that substantial evidence supports the determination of the trial court that the agreement in the present case was entered into voluntarily.
 

 I
 

 Sun and Barry met in Montreal in the summer of 1987 and maintained a relationship during ensuing months through telephone contacts. In October 1987, at Barry’s invitation, Sun visited him for 10 days at his home in Phoenix, Arizona. In November 1987, Sun moved to Phoenix to take up residence with Barry and, one week later, the two became engaged to be married. In January 1988, they decided to marry before the commencement of professional baseball’s spring training. On February 5, 1988, in Phoenix, the parties entered into a written premarital agreement in which each party waived any interest in the earnings and acquisitions of the other party during marriage.
 
 [1]
 
 That same day, they flew to Las Vegas, and were married the following day.
 

 Each of the parties then was 23 years of age. Barry, who had attended college for three years and who had begun his career in professional baseball in 1985, had a contract to play for the Pittsburgh Pirates. His annual salary at the time of the marriage ceremony was approximately $106,000. Sun had emigrated to Canada from Sweden in 1985, had worked as a waitress and bartender, and had undertaken some training as a cosmetologist, having
 
 *7
 
 expressed an interest in embarking upon a career as a makeup artist for celebrity clients. Although her native language was Swedish, she had used both French and English in her employment, education, and personal relationships when she lived in Canada. She was unemployed at the time she entered into the premarital agreement.
 

 Barry petitioned for legal separation on May 27, 1994, in California, the parties then being California residents. Sun requested custody of the parties’ two children, then three and four years of age. In addition, she sought child and spousal support, attorney fees, and a determination of property rights. The petition was amended to request dissolution, and the court bifurcated the trial proceedings, first adjudicating the issue of the validity of the premarital agreement and then reaching the remaining issues involving application of the agreement to the property held by the parties and the determination of spousal and child support. Child support was awarded in the amount of $10,000 per month per child. Spousal support was awarded in the amount of $10,000 per month, to terminate December 30, 1998. Only the first issue —the validity of the premarital agreement—is before this court.
 

 Barry testified that he was aware of teammates and other persons who had undergone bitter marital dissolution proceedings involving the division of property, and recalled that from the beginning of his relationship with Sun he told her that he believed his earnings and acquisitions during marriage should be his own. He informed her he would not marry without a premarital agreement, and she had no objection. He also recalled that from the beginning of the relationship, Sun agreed that their earnings and acquisitions should be separate, saying “what’s mine is mine, what’s yours is yours.” Indeed, she informed him that this was the practice with respect to marital property in Sweden. She stated that she planned to pursue a career and wished to be financially independent. Sun knew that Barry did not anticipate that she would shoulder her living expenses while she was not employed. She was not, in fact, employed during the marriage. Barry testified that he and Sun had no difficulty communicating.
 

 Although Barry testified that he had previous experience working with lawyers in the course of baseball contract negotiations and the purchase of real property, his testimony at trial did not demonstrate an understanding of the legal fine points of the agreement.
 

 Sun’s testimony at trial differed from Barry’s in material respects. She testified that her English language skills in 1987 and 1988 were limited. Out of pride, she did not disclose to Barry that she often did not understand him. She testified that she and Barry never discussed money or property during
 
 *8
 
 the relationship that preceded their marriage. She agreed that she had expressed interest in a career as a cosmetologist and had said she wished to be financially independent. She had very few assets when she took up residence with Barry, and he paid for all their needs. Their wedding arrangements were very informal, with no written invitations or caterer, and only Barry’s parents and a couple of friends, including Barry’s godfather Willie Mays, were invited to attend. No marriage license or venue had been arranged in advance of their arrival in Las Vegas.
 

 Several persons testified as to the circumstances surrounding the signing of the premarital agreement.
 

 Sun testified that on the evening before the premarital agreement was signed, Barry first informed her that they needed to go the following day to the offices of his lawyers, Leonard Brown and his associate Sabinus Megwa. She was uncertain, however, whether Barry made any reference to a premarital agreement. She testified that only at the parking lot of the law office where the agreement was to be entered into did she learn, from Barry’s financial adviser, Mel Wilcox, that Barry would not marry her unless she signed a premarital agreement. She was not upset. She was surprised, however, because Barry never had said that signing the agreement was a precondition to marriage. She did not question Barry or anyone else on this point. She was under the impression that Barry wished to retain separate ownership of property he owned before the marriage, and that this was the sole object of the premarital agreement. She was unaware the agreement would affect her future and was not concerned about the matter, because she was nervous and excited about getting married and trusted Barry. Wilcox’s statement had little effect on her, because she had no question but that she and Barry were to be married the following day.
 

 Sun recalled having to hurry to arrive at the lawyers’ office in time both to accomplish their business there and make the scheduled departure of the airplane to Las Vegas so that she and Barry could marry the next day. Sun recalled that once they arrived at the lawyers’ office on February 5, 1988, she, her friend Margareta Forsberg, Barry, and Barry’s financial adviser Mel Wilcox were present in a conference room. She did not recall asking questions or her friend asking questions, nor did she recall that any changes were made to the agreement. She declared that her English language skills were limited at the time and she did not understand the agreement, but she did not ask questions of anyone other than Margareta Forsberg or ask for more time, because she did not want to miss her flight and she was focussed on the forthcoming marriage ceremony. She did not believe that Barry understood the agreement either. Forsberg was unable to assist her. Sun did
 
 *9
 
 not recall the lawyers telling her that she should retain her own lawyer, that they were representing Barry and not her, that the applicable community property law provided that a spouse has an interest in the earnings and in acquisitions of the other spouse during marriage, or that she would be waiving this right if she signed the agreement. The lawyers may have mentioned the possibility of her being represented by her own lawyer, but she did not believe she needed one. She did not inform anyone at the meeting that she was concerned about the agreement; the meeting and discussion were not cut short, and no one forced her to sign the agreement.
 

 Forsberg, a native of Sweden and 51 years of age at the time the agreement was signed, confirmed that she was present when Attorneys Brown and Megwa explained the agreement, that Wilcox also was present, that no changes to the agreement were made at Sun’s or Forsberg’s request, and that she had been unable to answer Sun’s questions or explain to Sun the terminology used in the agreement. She confirmed that Sun’s English was limited, that the lawyers had explained the agreement, and that Sun never stated that she was considering not signing the agreement, that she did not understand it, or that she was not signing of her own free will. Sun never said that Barry threatened her or forced her to sign, that she wanted to consult independent counsel concerning the agreement, or that she felt pressured. Forsberg understood that Brown and Megwa were Barry’s attorneys, not Sun’s. She testified that when the attorneys explained the agreement, she did not recall any discussion of Sun’s community property rights.
 

 Barry and other witnesses offered a different picture of the circumstances leading to the signing of the premarital agreement, an account found by the trial court to be more credible in material respects, as reflected in its statement of decision. Barry and his attorney, Brown, recalled that approximately two weeks before the parties signed the formal agreement, they discussed with Sun the drafting of an agreement to keep earnings and acquisitions separate. Brown testified that he told Sun at this meeting that he represented Barry and that it might be in her best interest to obtain independent counsel.
 

 Barry, Brown, and Megwa testified that Wilcox was not present at the February 5, 1988,- meeting, which lasted between one and two hours, and that at the meeting the attorneys informed Sun of her right to independent counsel. All three recalled that Sun stated she did not want her own counsel, and Megwa recalled explaining that he and Brown did not represent her. Additionally, all three recalled that the attorneys read the agreement to her paragraph by paragraph and explained it as they went through it, also informing her of a spouse’s basic community property rights in earnings and
 
 *10
 
 acquisitions and that Sun would be waiving these rights. Megwa recalled it was clearly explained that Barry’s income and acquisitions during the marriage would remain Barry’s separate property, and he recalled that Sun stated that such arrangements were the practice in Sweden. Furthermore, Barry and the two attorneys each confirmed that Sun and Forsberg asked questions during the meeting and were left alone on several occasions to discuss its terms, that Sun did not exhibit any confusion, and that Sun indicated she understood the agreement. They also testified that changes were made to the agreement at Sun’s behest. Brown and Megwa experienced no difficulty in communicating with Sun, found her confident and happy, and had no indication that she was nervous or confused, intimidated, or pressured. No threat was uttered that unless she signed the agreement, the wedding would be cancelled, nor did they hear her express any reservations about signing the agreement. Additionally, legal secretary Ilia Washington recalled that Wilcox waited in another room while the agreement was discussed, that Sun asked questions and that changes were made to the agreement at her behest, that Sun was informed she could secure independent counsel, that Sun said she understood the contract and did not want to consult another attorney, and that she appeared to understand the discussions and to feel comfortable and confident.
 

 The trial court observed that the case turned upon the credibility of the witnesses. In support of its determination that Sun entered into the agreement voluntarily, “free from the taint of fraud, coercion and undue influence . . . with full knowledge of the property involved and her rights therein,” the trial court made the following findings of fact: “Respondent [Sun] knew Petitioner [Barry] wished to protect his present property and future earnings. Respondent knew . . . that the Agreement provided that . . . Petitioner’s present and future earnings would remain his separate property. . . . Respondent is an intelligent woman and though English is not her native language, she was capable of understanding the discussion by Attorney Brown and Attorney Megwa regarding the terms of the agreement and the effect of the Agreement on each [party’s] rights, H[] ". . . HQ . . . Respondent was not forced to execute the document, nor did anyone threaten Respondent in any way. Respondent never questioned signing the Agreement .or requested that she not sign the Agreement. Respondent’s refusal to sign the Agreement would have caused little embarrassment to her. The wedding was a small impromptu affair that could have been easily postponed. H]] Respondent had sufficient knowledge of the nature, value and extent of the property affected by the Agreement. Petitioner fully disclosed the nature, approximate value and extent of all of his assets to Petitioner, both prior to and on the day of the execution of the agreement. HI] Respondent had sufficient knowledge and understanding of her rights regarding the
 
 *11
 
 property affected by the Agreement, and how the Agreement adversely affected those rights. Respondent had the opportunity to read the Agreement prior to executing it. Attorneys Brown and Megwa explained to both parties their rights regarding the property affected by the Agreement, and how the Agreement adversely affected those rights. Respondent never stated prior to execution that she did not understand the meaning of the Agreement or the explanations provided by Petitioner’s attorneys. [^] Respondent had sufficient awareness and understanding of her right to, and need for, independent counsel. Respondent also had an adequate and reasonable opportunity to obtain independent counsel prior to execution of the Agreement. Respondent was advised at a meeting with Attorney Brown at least one week prior to execution of the Agreement that she had the right to have an attorney represent her and that Attorneys Brown and Megwa represented Petitioner, not Respondent. On at least two occasions during the February 5, 1988, meeting, Respondent was told that she could have separate counsel if she chose. Respondent declined. Respondent was capable of understanding this admonition. The wedding was a small impromptu affair that could have been easily postponed.”
 

 The court also determined that Barry and Sun were not in a confidential relationship at the time the agreement was executed. The trial court also declared that pursuant to a pretrial stipulation the burden of proof rested upon Sun, but that even if the court were to place the burden of proof upon Barry, Barry had demonstrated by clear and convincing evidence “that the agreement and its execution [were] free from the taint of fraud, coercion or undue influence” and that Sun “entered the agreement with full knowledge of the property involved and her rights therein.”
 

 The Court of Appeal in a split decision reversed the judgment rendered by the trial court and directed a retrial on the issue of voluntariness.
 
 [2]
 
 The majority stressed that Sun lacked independent counsel, determined that she had not waived counsel effectively, and concluded that under such circumstances the evidence must be subjected to strict judicial scrutiny to determine whether the agreement was voluntary. The majority asserted that Attorneys Brown and Megwa failed to explain that Sun’s interests conflicted with Barry’s, failed to urge her to retain separate counsel, and may have led Sun to believe they actually represented her interests as they explained the agreement paragraph by paragraph. The majority concluded that the trial court erred in failing to give proper weight to the circumstance that Sun was not represented by independent counsel. It asserted with regard to marital
 
 *12
 
 settlement agreements in dissolution actions that “the court should ‘carefully scrutinize the agreements’ when the party challenging the agreement did not have the advice of counsel [citation],” and that the same rule should apply to premarital agreements. It cited various other circumstances in the present case that, according to the majority, demonstrated a lack of voluntariness. The majority opinion pointed to Sun’s limited English language skills and lack of “legal or business sophistication,” and stated that she “received no explanation of the legal consequences to her ensuing from signing the contract” and “was told there would be ‘no marriage’ if she did not immediately sign the agreement.” It also referred to typographical errors and omissions in the agreement, the imminence of the wedding and the inconvenience and embarrassment of canceling it, Sun’s asserted lack of understanding that she was waiving her statutory right to a community property interest in Barry’s earnings, and the absence of an attorney acting as an advocate on her behalf.
 

 The dissenting justice contended that the majority had erred in failing to apply the appropriate legal standard to determine the voluntariness of the agreement and in failing to accord appropriate deference to the factual determinations of the trial court.
 

 We granted Barry’s petition for review.
 

 II
 

 We first consider whether the Court of Appeal majority applied the appropriate legal standard in resolving the question whether the premarital agreement was entered into voluntarily. We conclude it erred in holding that a premarital agreement in which one party is not represented by independent counsel should be subjected to strict scrutiny for voluntariness. Such a holding is inconsistent with Family Code section 1615, which governs the enforceability of premarital agreements.
 

 A
 

 From the inception of its statehood, California has retained the community property law that predated its admission to the Union and consistently has provided as a general rule that property acquired by spouses during marriage, including earnings, is community property. (See Fam. Code, § 760; see also former Civ. Code, § 5110, added by Stats. 1969, ch. 1608, § 8, p. 3339 and repealed by Stats. 1992, ch. 162, § 3, p. 464; Stats. 1850, ch. 103, § 2, p. 254;
 
 Stewart v. Stewart
 
 (1926) 199 Cal. 318, 321-322 [249 P. 197]; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Community Property, §§ 1-3, pp. 374-377.)
 

 
 *13
 
 At the same time, applicable statutes recognized the power of parties contemplating a marriage to reach an agreement containing terms at variance with community property law. Thus in 1850, the Legislature provided that community property principles shall govern the rights of the parties “unless there is a marriage contract, containing stipulations contrary thereto.” (Stats. 1850, ch. 103, § 14, p. 255; see also former Civ. Code, § 5133, added by Stats. 1969, ch. 1608, § 8, p. 3343 [community property law governs property of husband and wife “unless there is a marriage settlement containing stipulations contrary thereto”]; former Civ. Code, § 177 (enacted in 1872);
 
 Barker v. Barker
 
 (1956) 139 Cal.App.2d 206, 212 [293 P.2d 85] [“Parties contemplating marriage may validly contract as to their property rights, both as to property then owned by them and as to property, including earnings, which may be acquired by them after marriage [citations], and the codes provide for such agreements (see [former] Civ. Code, §§ 177-181 . . .)”]; see also Fam. Code, § 1500 [“The property rights of husband and wife prescribed by statute may be altered by a premarital agreement or other marital property agreement”].)
 

 There is nothing novel about statutory provisions recognizing the ability of parties to enter into premarital agreements regarding property, because such agreements long were common and legally enforceable under English law,
 
 [3]
 
 and have enjoyed a lengthy history in this country.
 
 [4]
 
 In California, a premarital agreement generally has been considered to be enforceable as a contract, although when there is proof of fraud, constructive fraud, duress, or undue influence, the contract is not enforceable. (See
 
 Estate of Wamack
 
 (1955) 137 Cal.App.2d 112, 116-117 [289 P.2d 871];
 
 La Liberty
 
 v.
 
 La Liberty
 
 (1932) 127 Cal.App. 669, 672-673 [16 P.2d 681].) The rules applicable to the interpretation of contracts have been applied generally to premarital agreements. (See
 
 Barham v. Barham
 
 (1949) 33 Cal.2d 416, 422 [202 P.2d 289];
 
 In re Marriage of Garrity and Bishton
 
 (1986) 181 Cal.App.3d 675, 683 [226 Cal.Rptr. 485].)
 

 At one time, a premarital agreement that was not made in contemplation that the parties would remain married until death was considered to be
 
 *14
 
 against public policy in California and other jurisdictions (see
 
 In re Marriage of Higgason
 
 (1973) 10 Cal.3d 476, 485 [110 Cal.Rptr. 897, 516 P.2d 289]; see also
 
 Brooks
 
 v.
 
 Brooks, supra,
 
 733 P.2d at pp. 1048-1049, fn. 4, and cases cited), but this court concluded in 1976 that the validity of a premarital agreement “does not turn on whether the parties contemplated a lifelong marriage.”
 
 (In re Marriage of Dawley
 
 (1976) 17 Cal.3d 342, 352 [131 Cal.Rptr. 3, 551 P.2d 323].) The latter opinion was in conformity with the emerging view in other jurisdictions that a premarital agreement concerning the disposition of property upon the dissolution of a marriage was not against public policy. (See
 
 Posner v. Posner
 
 (Fla. 1970) 233 So.2d 381, 385 [often cited as the seminal opinion on this issue].)
 

 Persons contemplating marriage began to enter into agreements setting out property rights in contemplation of marital dissolution—rights that differed from those that would accrue under applicable statutes—but there was some uncertainty and considerable lack of uniformity regarding the circumstances under which such agreements would be enforceable. (See 9B West’s U. Laws Ann. (1987) U. Premarital Agreement Act (1983) Prefatory Note, p. 369.) In order to encourage enforcement of such agreements on a more certain and uniform basis, while, according to the drafters of the act, retaining some “flexibility,” the Uniform Premarital Agreement Act (hereafter sometimes referred to as the Uniform Act) was promulgated in 1983. (9B West’s U. Laws Ann.,
 
 supra,
 
 Uniform Act, Prefatory Note, p. 369.)
 

 In 1985, the California Legislature adopted most of the provisions of the Uniform Act. (Fam. Code § 1600 et seq. (hereafter referred to sometimes as the California Uniform Act); see former Civ. Code, § 5300 et seq., added by Stats. 1985, ch. 1315, § 3, p. 4582; Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1143 (1985-1986 Reg. Sess.) p. 2; Assem. 3d reading digest of Sen. Bill No. 1143 (1985-1986 Reg. Sess.) as amended Aug. 28, 1985, p. 3.) The only provisions of the Uniform Act omitted by the California Legislature were those permitting the parties to waive the right to spousal support and limiting the right to waive spousal support where such a waiver would result in a spouse’s becoming a public charge. (Compare Fam. Code, § 1600 et seq. with 9B West’s U. Laws Ann.,
 
 supra,
 
 Uniform Act, § 3, subd. (a)(4), p. 373;
 
 id..,
 
 § 6, subd. (b), p. 376.) This legislative omission is examined in today’s decision in
 
 In re Marriage of Pendleton & Fireman
 
 (2000) 24 Cal.4th 39 [99 Cal.Rptr.2d 278, 5 P.3d 839], but is not involved in the present case.
 

 B
 

 The California enactment, like the Uniform Act, sets out the law of premarital agreements, including such matters as the nature of property
 
 *15
 
 subject to such agreements, the requirement of a writing, and provision for amendments. (See Fam. Code, §§ 1611-1614.) Section 1615 of the Family Code, like section 6 of the Uniform Act, regulates the enforceability of such agreements. It provides in pertinent part: “(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following: [f] (1) That party did not execute the agreement voluntarily. [H] (2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party: [ft] (A) That party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party, ftj] (B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided. [^] (C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.”
 

 Pursuant to Family Code section 1615, a premarital agreement will be enforced unless the party resisting enforcement of the agreement can demonstrate either (1) that he or she did not enter into the contract voluntarily, or (2) that the contract was unconscionable when entered into
 
 and
 
 that he or she did not have actual or constructive knowledge of the assets and obligations of the other party and did not voluntarily waive knowledge of such assets and obligations. In the present case, the trial court found no lack of knowledge regarding the nature of the parties’ assets, a necessary predicate to considering the issue of unconscionability, and the Court of Appeal accepted the trial court’s determination on this point. We do not reconsider this factual determination, and thus the question of unconscionability is not before us. We also do not review the determination of the Court of Appeal that California law, rather than Arizona law, governs the enforceability of this agreement, and we express no opinion on this point. Thus, the only issue we face concerns the trial court’s determination that Sun entered into the agreement voluntarily.
 

 Neither the article of the Family Code in which section 1615 is located, nor the Uniform Act, defines the term “voluntarily.” Certain rules of construction guide us in our interpretation of this term. “We begin with the fundamental rule that a court ‘should ascertain the intent of the Legislature so as to effectuate the purpose of the law.’ [Citation.] In determining such intent ‘[t]he court turns first to the words themselves for the answer.’ [Citation].”
 
 (Moyer v. Workmen’s Comp. Appeals Bd.
 
 (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) “‘Words used in a statute . . . should be given the meaning they bear in ordinary use.’ ”
 
 (Wilcox v. Birtwhistle
 
 (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727].) If
 
 *16
 
 the language reasonably may be interpreted in more than one way, we may consult extrinsic aids to determine the intent of the Legislature.
 
 (Ibid.)
 

 Courts frequently consult dictionaries to determine the usual meaning of words.
 
 (Romano v. Rockwell Internal., Inc.
 
 (1996) 14 Cal.4th 479, 493 [59 Cal.Rptr.2d 20, 926 P.2d 1114];
 
 Moyer v. Workmen’s Comp. Appeals Bd., supra,
 
 10 Cal.3d at pp. 230-231.) Black’s Law Dictionary defines “voluntarily” as “Done by design .... Intentionally and without coercion.” (Black’s Law Diet. (6th ed. 1990) p. 1575.) The same source defines “voluntary” as “Proceeding from the free and unrestrained will of the person. Produced in or by an act of choice. Resulting from free choice, without compulsion or solicitation. The word, especially in statutes, often implies knowledge of essential facts.”
 
 (Ibid.)
 
 The Oxford English Dictionary defines “voluntarily” as “[o]f one’s own free will or accord; without compulsion, constraint, or undue influence by others; freely, willingly.” (19 Oxford English Diet. (2d ed. 1989) p. 753.)
 

 To the extent it is unclear on the face of the statute what was intended by the Legislature in employing the term “voluntarily,” we consult the history of the statute and consider its general intent in order to determine the sense in which the Legislature used the term. (See
 
 People v. Cruz
 
 (1996) 13 Cal.4th 764, 773-774 & fn. 5 [55 Cal.Rptr.2d 117, 919 P.2d 731];
 
 Moyer v. Workmen’s Comp. Appeals Bd., supra,
 
 10 Cal.3d at p. 232 [meaning of the term “voluntary” is construed in a manner designed to carry out the apparent intent of the workers’ compensation law].)
 

 The debate that preceded the adoption of the Uniform Act indicated a basic disagreement between those commissioners at the National Conference of Commissioners on Uniform State Laws who placed the highest value on certainty in enforcement of premarital agreements and the vocal minority of commissioners who urged that such contracts routinely should be evaluated for substantive fairness at the time of enforcement. (See National Conference of Commissioners on Uniform State Laws, Proceedings in Committee of the Whole, U. Premarital Agreement Act (July 23-26, 1983) pp. 49-97 (Proceedings, Uniform Act).) Indeed, over sharp and repeated objection from commissioners of the minority view, eventually it was settled that the party against whom enforcement of a premarital agreement was sought only could raise the issue of unconscionability, that is, the substantive unfairness of an agreement, if he or she also could demonstrate lack of disclosure of assets, lack of waiver of disclosure,
 
 and
 
 lack of imputed knowledge of assets. The language adopted was intended to
 
 enhance
 
 the enforceability of premarital agreements and to convey the sense that an agreement voluntarily entered into would be enforced without regard to the apparent unfairness of
 
 *17
 
 its terms, as long as the objecting party knew or should have known of the other party’s assets, or voluntarily had waived disclosure. (Proceedings, Uniform Act,
 
 supra,
 
 pp. 52, 54, 75, 76, 80, 100, 101.) The commissioners, however, did not supply a definition of the term “voluntarily,” nor was there much discussion of the term.
 

 We find an indication of the commissioners’ understanding of the term in their official comment to the enforcement provision of the Uniform Act, stating that the conditions to enforcement “are comparable to concepts which are expressed in the statutory and decisional law of many jurisdictions.” (9B West’s U. Laws Ann.,
 
 supra,
 
 Uniform Act, com. to § 6, p. 376.) In support of this statement, the comment cites cases from various jurisdictions examining the voluntariness of premarital agreements. These cases vary in their formal approach to the problem—some engage in a presumption of undue influence and place the burden of proof on the party seeking to enforce the agreement (see
 
 Lutgert v. Lutgert
 
 (Fla.Dist.Ct.App. 1976) 338 So.2d 1111, 1113-1117), while some place the burden of proof on the person challenging the agreement.
 
 (In re Kaufmann’s Estate
 
 (1961) 404 Pa. 131 [171 A.2d 48, 50-51].) In the majority of these cases, however, the question is viewed as one involving such ordinary contract defenses as fraud, undue influence, or duress, along with some examination of the parties’ knowledge of the rights being waived, or at least knowledge of the intent of the agreement.
 
 [5]
 

 These cases demonstrate the commissioners’ belief that a number of factors are relevant to the issue of voluntariness. In considering defenses proffered against enforcement of a premarital agreement, the court should consider whether the evidence indicates coercion or lack of knowledge
 
 *18
 
 —just as would be suggested by the dictionary definitions of voluntariness noted above. Specifically, the cases cited in the comment to the enforcement provision of the Uniform Act direct consideration of the impact upon the parties of such factors as the coercion that may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining power—in some cases indicated by the relative age and sophistication of the parties; whether there was full disclosure of assets; and the parties’ understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement.
 
 [6]
 

 The cases cited in the comment to the enforcement provision of the Uniform Act indicate that the commissioners considered that the voluntariness of a premarital agreement may turn in part upon whether the agreement was entered into knowingly, in the sense that the parties understood the terms or basic effect of the agreement. (See
 
 Hafner v. Hafner, supra,
 
 295 N.W.2d at pp. 571-572 [objecting party understood purpose of the agreement];
 
 Del Vecchio v. Del Vecchio, supra,
 
 143 So.2d at p. 21 [noting that the party challenging the agreement had some understanding of the marital rights being waived];
 
 In re Marriage of Coward, supra,
 
 582 P.2d at pp. 835-836 [noting objecting party’s awareness of the intent of the agreement].) A premarital agreement often contains at least some hallmarks of a waiver, in that it may bind a person to forgo important rights secured by community property law—rights that in the absence of an agreement would vest automatically upon marriage. (See
 
 Del Vecchio v. Del Vecchio, supra,
 
 143 So.2d at p. 20; see also
 
 Estate of Schwartz
 
 (1947) 79 Cal.App.2d 308, 310 [179 P.2d 868] [examining a premarital agreement for proper waiver of marital rights];
 
 In re Marriage of Spiegel
 
 (Iowa 1996) 553 N.W.2d 309, 315 [drawing the same analogy to the waiver doctrine in examining the voluntariness of premarital agreements]; Younger,
 
 Perspectives on Antenuptial Agreements, supra,
 
 40 Rutgers L.Rev. at p. 1078 [same].) We observe that the factors relevant to the voluntariness of a waiver generally depend upon the statutory scheme involved, and most frequently it is required that a waiver be entered into with knowledge of the effect of the agreement.
 
 (See Moyer
 
 v.
 
 Workmen’s Comp. Appeals Bd., supra,
 
 10 Cal.3d 222.) Similarly, the cases cited in the comment to the enforcement section (§ 6) of the Uniform Act indicate that the parties’ general understanding of the effect of the agreement constitutes a factor for the court to consider in determining whether the parties entered into the agreement voluntarily.
 

 The commissioners’ debate over the problem of unconscionability throws further light on their view of the voluntariness requirement, which, as noted,
 
 *19
 
 did not receive much explicit discussion. Those taking the minority view noted with concern that the proposed Uniform Act would enforce agreements that might be declared void as unconscionable under the Uniform Commercial Code, because the Uniform Act precluded consideration of the substantive fairness of the agreement unless the party challenging the agreement also could prove lack of notice of the other party’s assets and obligations.
 
 [7]
 
 Commissioners who valued substantive fairness over certainty of enforcement urged, for example, that if a premarital agreement waiving property rights is entered into between a pregnant teenager—who wishes to ensure the legitimacy of her child—and an older man, the agreement should be subject to searching scrutiny for unconscionability; those taking the majority position countered that the requirement that the contract be entered into voluntarily provided adequate protection to the weaker party. (Proceedings, Uniform Act,
 
 supra,
 
 pp. 71-73.) In addition, it was clear from their discussion that the commissioners anticipated that such defenses as lack of capacity, fraud, duress, and undue influence would apply in determining the voluntariness of the agreement.
 
 (Id.
 
 p. 131.)
 

 In sum, it is clear from the cases cited in the comment to the enforcement section of the Uniform Act and from the record of the proceedings of the National Conference of Commissioners on Uniform State Laws that the commissioners intended that the party seeking to avoid a premarital agreement may prevail by establishing that the agreement was involuntary, and that evidence of lack of capacity, duress, fraud, and undue influence, as demonstrated by a number of factors uniquely probative of coercion in the premarital context, would be relevant in establishing the involuntariness of the agreement.
 

 Not only did the commissioners intend that the above factors be considered in determining whether a premarital agreement was entered into voluntarily, but the same intention safely may be attributed to the California Legislature, because an examination of the history of the enactment of Family Code section 1615 in California indicates that the Legislature adopted the views of the commissioners in all respects relevant to the present discussion.
 
 [8]
 

 Decisions interpreting the enforcement provision of the Uniform Act in other jurisdictions also refer to such factors as inequality of bargaining
 
 *20
 
 power, coercion arising from circumstances peculiar to an imminent wedding, the absence of independent counsel for one party, and the parties’ knowledge of the purpose of the agreement.
 
 [9]
 
 The factors we have identified also are in most respects consistent with recent non-Uniform Act cases in other jurisdictions that examine what often is termed the procedural fairness of premarital agreements.
 
 [10]
 
 These factors also are consistent with the circumstances previously considered in this state, prior to California’s adoption of the Uniform Act, in connection with the issue of the voluntariness of a premarital agreement. In
 
 In re Marriage of Dawley, supra, 17
 
 Cal.3d 342, for example, we rejected the wife’s claim that a premarital agreement waiving community property rights had been obtained through undue influence,
 
 *21
 
 pointing out that in the particular case the pressure to marry created by an unplanned pregnancy fell equally on both the parties, that both parties were educated and employed, and that the party challenging the agreement did not rely upon the other party’s advice, but consulted her own attorney.
 
 (Id.
 
 at p. 355 and fn. 8; see also
 
 Estate of Cantor
 
 (1974) 39 Cal.App.3d 544, 548-549 [114 Cal.Rptr. 160] [finding that the party disputing a premarital agreement made a knowing waiver of his marital rights];
 
 La Liberty
 
 v.
 
 La Liberty, supra,
 
 127 Cal.App. at pp. 673-674 [rejecting lack of independent counsel as a basis for rescission, given the parties’ apparent understanding of the meaning of the premarital agreement].)
 

 We have considered the range of factors that may be relevant to establish the involuntariness of a premarital agreement in order to consider whether the Court of Appeal erred in according such great weight to one factor—the presence or absence of independent counsel for each party. As we shall explain, we do not believe that the terms or history of section 1615 of the Family Code support the conclusion of the Court of Appeal majority that a premarital agreement should be subjected to strict scrutiny for voluntariness in the absence of independent counsel for the less sophisticated party or of an assertedly effective and knowing waiver of counsel comparable to that occurring in the criminal law setting (and potentially also requiring an offer by the represented party to pay for independent counsel for the other party).
 

 In the official comment to the Uniform Act, the commissioners stated: “Nothing in [the enforcement section] makes the absence of assistance of independent legal counsel a condition for the unenforceability of a premarital agreement. However, lack of that assistance may well be a factor in determining whether the conditions stated in [the section] may have existed [citation].” (See 9B West’s U. Laws Ann.,
 
 supra,
 
 Uniform Act, com. to § 6, p. 377.)
 

 It is clear from the history of the Uniform Act that the commissioners rejected the view that independent counsel was essential to the enforceability of premarital agreements. Although the proposed Uniform Act initially contained a proviso stating that premarital agreements were presumptively valid unless the party against whom enforcement was sought was not represented by independent legal counsel or there was not full disclosure, the commissioners eventually removed any reference to independent counsel. (Proceedings, Uniform Act,
 
 supra,
 
 pp. 3-4.) A commissioner explained the action of the executive committee in removing the proviso: “We feel that, certainly, that representation would be a
 
 factor
 
 in determining whether the party acted voluntarily and knowingly. We do not believe, however, that
 
 *22
 
 legal representation alone would be a desirable basis for enforcement.”
 
 {Ibid.,
 
 italics added.) An amendment was proposed to restore the omitted provision, but it was rejected with the comment that “the legislatures of the states ought [not] to be making the rights of people dependent upon whether or not they have lawyers,” and the observation that such a rule would not reduce litigation but instead would transfer the litigation to malpractice actions. (Proceedings, Uniform Act,
 
 supra,
 
 pp. 61-62.)
 

 Further, in the comment to the enforcement section of the Uniform Act, the commissioners cited cases that discussed the presence or absence of independent counsel, or at least a reasonable opportunity to consult independent counsel, as simply a
 
 factor
 
 to consider in determining the voluntariness of the agreement. (See
 
 Lutgert v. Lutgert, supra,
 
 338 So.2d at pp. 1115-1117 [among other coercive circumstances, the prospective wife had no opportunity to consult independent counsel, and her conversation with the prospective husband’s attorney did not result in any amendment of the agreement];
 
 Hafner v. Hafner, supra,
 
 295 N.W.2d at pp. 571-572 [the prospective wife did not have independent counsel, but the agreement was enforceable largely because she understood its purpose];
 
 Del Vecchio v. Del Vecchio, supra,
 
 143 So.2d at pp. 19-20 [it is preferable, but not required, that each party have independent counsel];
 
 In re Marriage of Coward, supra,
 
 582 P.2d at p. 836 [the prospective wife’s opportunity to consult independent counsel and the advice of the prospective husband’s attorney that she do so were factors in support of the enforcement of the premarital agreement, along with the circumstance that the arrangement had been discussed over a period of time, and in view of the prospective wife’s knowledge of the business world and of the assets involved, and her clear understanding of the intent of the agreement];
 
 Matter of Estate ofLebsock, supra,
 
 618 P.2d at p. 686 [trial court correctly refused to instruct the jury that the agreement was invalid unless the prospective wife had independent counsel]; see also Annot. (1987) 53 A.L.R.4th 85, 106-134 [collecting cases analyzing presence of counsel as a factor in determining enforceability of premárital agreements].) This is consistent with case law in California before its enactment of the Uniform Act.
 
 (La Liberty
 
 v.
 
 La Liberty, supra,
 
 127 Cal.App. at pp. 673-674.)
 

 As noted, few state courts have interpreted their own versions of the Uniform Act, but one court that has considered under the act the relationship of independent counsel to the question of voluntariness is the Supreme Court of North Dakota. That court, reversing the grant of summary judgment in favor of heirs seeking enforcement of a premarital agreement in which the parties waived their share in the other party’s estate, determined that issues of fact remained regarding the voluntariness of the wife’s endorsement of the premarital agreement. Specifically, the court noted a factual dispute as to
 
 *23
 
 whether the wife adequately was advised to obtain independent counsel. It observed that under North Dakota law, the parties were in a confidential relationship and, observing that the state has an interest in every marriage contract, concluded: “We agree with the view that lack of adequate legal advice to a prospective spouse to obtain independent counsel is a significant factual factor in weighing the voluntariness of a premarital agreement, [ft] Indeed, adequate legal representation will often be the best evidence that a spouse signed a premarital agreement knowledgeably and voluntarily.”
 
 (Matter of Estate of Lutz, supra,
 
 563 N.W.2d at p. 98.) But even the North Dakota court acknowledged that no state has made the presence of independent counsel a prerequisite to enforceability.
 
 (Id.
 
 at p. 97.) The Rhode Island Supreme Court has determined that independent counsel is not required for enforcement of premarital agreements under the Uniform Act.
 
 (Penhallow v. Penhallow, supra,
 
 649 A.2d at p. 1022; see also
 
 Marsh
 
 v.
 
 Marsh, supra,
 
 949 S.W.2d at pp. 740-741 [lack of independent counsel is not dispositive under the Uniform Act; disadvantaged spouse had been advised to seek separate counsel];
 
 Lebeck v. Lebeck, supra,
 
 881 P.2d at p. 734 [one factor in favor of enforcement was review of agreement by independent counsel].)
 

 It seems evident that the commissioners who enacted the Uniform Act intended that the presence of independent counsel (or a reasonable opportunity to consult counsel) should be merely one factor among several that a court should consider in examining a challenge to the voluntariness of a premarital agreement. Moreover, the overall purpose of the Uniform Act was to
 
 enhance
 
 the enforceability of premarital agreements, a goal that would not be furthered if agreements were presumed to be of doubtful voluntariness unless both parties were represented by independent counsel. When we also consider the circumstance that in a majority of dissolution cases in California at least one of the two parties apparently is not represented by counsel (Judicial Council of Cal., Ann. Rep. (1998) State Court Outlook, p. 40), it seems unlikely that our Legislature intended that the voluntariness of a premarital agreement should be subjected to strict scrutiny unless each party were represented by independent counsel or an unrepresented party had entered into a formal knowing waiver of counsel comparable to that required in the criminal law setting, as the Court of Appeal holding apparently would require. We also note that in those instances in which the Legislature has intended that the presence of independent counsel should be a critical factor in the enforceability of an agreement, it has explicitly so provided. When, for example, by an agreement entered into either before or during marriage, a person waives his or her statutory inheritance rights as a surviving spouse, the waiver generally is enforceable unless the surviving spouse proves that he or she did not obtain a fair disclosure of the property involved or that “[t]he surviving spouse was not represented by independent legal counsel at
 
 *24
 
 the time of signing of the waiver.” (Prob. Code, § 143, subd. (a)(2).) Again, such a requirement does not appear in the California Uniform Act.
 

 Finally, and perhaps most significantly, the rule created by the Court of Appeal would have the effect of shifting the burden of proof on the question of voluntariness to the party seeking enforcement of the premarital agreement, even though the statute expressly places the burden upon the party challenging the voluntariness of the agreement. Because the commissioners and our Legislature placed the burden of proof of involuntariness upon the party
 
 challenging
 
 a premarital agreement, it seems obvious that the party seeking enforcement should not be required to prove that the
 
 absence
 
 of any factor tending to establish voluntariness did
 
 not
 
 render the agreement involuntary—the inevitable result were we to adopt the strict scrutiny standard suggested by the Court of Appeal.
 

 We conclude that although the ability of the party challenging the agreement to obtain independent counsel is an important factor in determining whether that party entered into the agreement voluntarily, the Court of Appeal majority erred in directing trial courts to subject premarital agreements to strict scrutiny where the less sophisticated party does not have independent counsel and has not waived counsel according to exacting waiver requirements.
 

 C
 

 Although we agree with Barry that the lack of independent counsel for each party cannot alter the burden of proof that, by operation of statute, rests upon the party challenging the validity of the premarital agreement, we also agree with the Court of Appeal majority that considerations applicable in commercial contexts do not necessarily govern the determination whether a premarital agreement was entered into voluntarily.
 

 Some of the commissioners debating the Uniform Act appeared to equate a premarital agreement with a commercial contract, and one court has emphasized that both parties contemplating marriage possess freedom of contract, which should not be restricted except as it would be in the context of a commercial contract.
 
 (Simeone v. Simeone
 
 (1990) 525 Pa. 392 [581 A.2d 162, 165-166] [not interpreting the Uniform Act].) Even apart from the circumstance that there is no statutory requirement that commercial contracts be entered into voluntarily as that term is used in Family Code section 1615, we observe some significant distinctions between the two types of contracts. A commercial contract most frequently constitutes a private regulatory agreement intended to ensure the successful outcome of the business between the contracting parties—in essence, to guide their relationship so that
 
 *25
 
 the object of the contract may be achieved. Normally, the execution of the contract ushers in the applicability of the regulatory scheme contemplated by the contract and the endeavor that is the object of the contract. As for a premarital agreement (or clause of such an agreement) providing solely for the division of property upon marital dissolution, the parties generally enter into the agreement anticipating that it never will be invoked, and the agreement, far from regulating the relationship of the contracting parties and providing the method for attaining their joint objectives, exists to provide for eventualities that will arise only if the relationship founders, possibly in the distant future under greatly changed and unforeseeable circumstances.
 

 Furthermore, marriage itself is a highly regulated institution of undisputed social value, and there are many limitations on the ability of persons to contract with respect to it, or to vary its statutory terms, that have nothing to do with maximizing the satisfaction of the parties or carrying out their intent. Such limitations are inconsistent with the freedom-of-contract analysis espoused, for example, by the Pennsylvania Supreme Court. (See
 
 Simeone v. Simeone, supra,
 
 581 A.2d at p. 165.) We refer to rules establishing a duty of mutual financial support during the marriage (Fam. Code, § 720) and prohibiting agreements in derogation of the duty to support a child of the marriage (Fam. Code, §§ 1612, subd. (b), 3900-3901;
 
 Armstrong v. Armstrong
 
 (1976) 15 Cal.3d 942, 947 [126 Cal.Rptr. 805, 544 P.2d 941];
 
 In re Marriage of Buzzanca
 
 (1998) 61 Cal.App.4th 1410, 1426-1427, fn. 17 [72 Cal.Rptr.2d 280, 77 A.L.R.5th 775]); the unenforceability of a promise to marry (Civ. Code, § 43.5, subd. (d);
 
 Askew v. Askew
 
 (1994) 22 Cal.App.4th 942, 954-957 [28 Cal.Rptr.2d 284] [tracing the history of the rule that breach of a promise to marry does not give rise to an action in contract or tort]); the circumstance that a party may abandon the marriage unilaterally under this state’s no-fault laws; and the pervasive state involvement in the dissolution of marital status, the marriage contract, and the arrangements to be made for the children of the marriage—even without consideration of the circumstance that marriage normally lacks a predominantly commercial object. We also observe that a premarital agreement to raise children in a particular religion is not enforceable.
 
 (In re Marriage of Weiss
 
 (1996) 42 Cal.App.4th 106, 113-115 [49 Cal.Rptr.2d 339].) We note, too, that there is authority—as conceded by the commissioners who considered the Uniform Act—to the effect that a contract to pay a spouse for personal services such as nursing cannot be enforced, despite the undoubted economic value of the services (see
 
 Borelli
 
 v.
 
 Brusseau
 
 (1993) 12 Cal.App.4th 647, 651-654 [16 Cal.Rptr.2d 16]; see also Silbaugh,
 
 Marriage Contracts and the Family Economy
 
 (1998) 93 N.W.U. L.Rev. 65, 123 [most jurisdictions will not enforce agreements with respect to personal services rendered during marriage]; Note,
 
 Planning for Love: The Politics of Prenuptial Agreements, supra,
 
 49 Stan. L.Rev. at p.
 
 *26
 
 900 [same]). These limitations demonstrate further that freedom of contract with respect to marital arrangements is tempered with statutory requirements and case law expressing social policy with respect to marriage.
 

 There also are obvious differences between the remedies that realistically may be awarded with respect to commercial contracts and premarital agreements. Although a party seeking rescission of a commercial contract, for example, may be required to restore the status quo ante by restoring the consideration received, and a party in breach may be required to pay damages, the status quo ante for spouses cannot be restored to either party, nor are damages contemplated for breach of the marital contract. In any event, the suggestion that commercial contracts are strictly enforced without regard to the fairness or oppressiveness of the terms or the inequality of the bargaining power of the parties is anachronistic and inaccurate, in that claims such as duress, unconscionability, and undue influence turn upon the specific context in which the contract is formed. (See Bix,
 
 Bargaining in the Shadow of Love: The Enforcement of Premarital Agreements and How We Think About Marriage
 
 (1998) 40 Wm. & Mary L.Rev. 145, 163, 182, 188, 205; see also Atwood,
 
 Ten Years Later: Lingering Concerns About the Uniform Premarital Agreement Act
 
 (1993) 19 J. Legis. 127, 146.)
 

 We also have explained generally that we believe the reference to voluntariness in the Uniform Act was intended to convey an element of knowing waiver that is not a consistent feature of commercial contract enforcement. Further, although the Uniform Act contemplated that contract defenses should apply, in the sense that an agreement should be free from fraud (including constructive fraud), duress, or undue influence, it is clear from the debate of the commissioners who adopted the Uniform Act and the cases cited in support of the enforcement provision of the Uniform Act that subtle coercion that would not be considered in challenges to ordinary commercial contracts may be considered in the context of the premarital agreement. (See, e.g.,
 
 Lutgert v. Lutgert, supra,
 
 338 So.2d at pp. 1113-1116 [agreement presented too close to the wedding, with passage booked on an expensive cruise].) The obvious distinctions between premarital agreements and ordinary commercial contracts lead us to conclude that factual circumstances relating to contract defenses (see Civ. Code, § 1567) that would not necessarily support the rescission of a commercial contract may suffice to render a premarital agreement unenforceable. The question of voluntariness must be examined in the unique context of the marital relationship. (See Brandt,
 
 The Uniform Premarital Agreement Act and the Reality of Premarital Agreements in Idaho
 
 (1997) 33 Idaho L.Rev. 539, 546-547, 562-564; Younger,
 
 Perspectives on Antenuptial Agreements: An Update
 
 (1992) 8 J. Am. Acad. Matrim. Law. 1, 19-20; Younger,
 
 Perspectives on Antenuptial Agreements, supra,
 
 40
 
 *27
 
 Rutgers L.Rev. at p. 1075; see also ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations (Tent. Draft No. 4, Apr. 10, 2000) § 7.02, corns, (a), pp. 90-91, (c), pp. 92-94;
 
 id.,
 
 § 7.05, com. (b), pp. 100-101;
 
 id.,
 
 § 7.07, com. (b), pp. 132-134.)
 

 On the other hand, we do not agree with Sun and the Court of Appeal majority that a
 
 premarital
 
 agreement should be interpreted and enforced under the same standards applicable to
 
 marital
 
 settlement agreements. First, although persons, once they are married, are in a fiduciary relationship to one another (Fam. Code, § 721, subd. (b)), so that whenever the parties enter into an agreement in which one party gains an advantage, the advantaged party bears the burden of demonstrating that the agreement was not obtained through undue influence
 
 (In re Marriage of Haines
 
 (1995) 33 Cal.App.4th 277, 293 [39 Cal.Rptr.2d 673]), a different burden applies under the Uniform Act in the premarital setting. Even when the premarital agreement clearly advantages one of the parties, the party challenging the agreement bears the burden of demonstrating that the agreement was not entered into voluntarily. Further, under the Uniform Act, even when there has been a failure of disclosure, the statute still places the burden upon the party challenging the agreement to prove that the terms of the agreement were unconscionable when executed, rather than placing the burden on the advantaged party to demonstrate that the agreement was not unconscionable. Thus the terms of the act itself do not support the Court of Appeal’s conclusion that the Legislature intended that premarital agreements should be interpreted in the same manner as agreements entered into during marriage.
 

 In particular, we believe that both the Court of Appeal majority and Sun err to the extent they suggest that the Uniform Act or its California analog established that persons who enter into premarital agreements must be presumed to be in a confidential relationship, a status that would give rise to the fiduciary duties between spouses expressly established by section 721 of the Family Code. California law prior to the enactment of the Uniform Act was to the contrary (see
 
 In re Marriage of Dawley, supra,
 
 17 Cal.3d at p. 355 [persons entering into prenuptial agreement are not presumed to be in a confidential relationship]), and we discern nothing in the Uniform Act suggesting that its adoption in California was intended to overrule our earlier decision.
 

 The primary consequences of designating a relationship as fiduciary in nature are that the parties owe a duty of full disclosure, and that a presumption arises that a party who owes a fiduciary duty, and who secures a benefit through an agreement, has done so through undue influence. (See 1 Witkin, Summary of Cal. Law (9th ed.1987) Contracts, §§ 425, 426, pp. 381-383;
 
 *28
 
 see also Civ. Code, § 1575.) For example, a transaction in which an attorney gains an advantage over his or her client “is presumptively invalid, and the attorney must show not only that it was fair, but that the client was fully informed of all facts necessary to enable him to deal at arm’s length.” (1 Witkin, Summary of Cal. Law,
 
 supra,
 
 Contracts, § 425, pp. 381-382, italics omitted.) It long has been the rule that “[w]hen an interspousal transaction advantages one spouse, ‘[t]he law, from considerations of public policy, presumes such transactions to have been induced by undue influence.’ ”
 
 (In re Marriage of Haines, supra,
 
 33 Cal.App.4th at p. 293, quoting
 
 Brison
 
 v.
 
 Brison
 
 (1888) 75 Cal. 525, 529 [17 P. 689].)
 

 California law also recognizes a lesser degree of confidential relationship that
 
 may
 
 arise, for example, between family members and between friends. (See 1 Witkin, Summary of Cal. Law,
 
 supra,
 
 Contracts, § 427, pp. 383-384.) In such cases “mere
 
 lack of independent advice
 
 is not sufficient to raise a presumption of undue influence or of constructive fraud, even when the consideration appears inadequate. But when to these factors is added some other such as great age, weakness of mind, sickness or other incapacity, the presumption arises, and the burden is on the other party to show that no oppression took place.”
 
 (Ibid.,
 
 italics in original; see also
 
 Tyler
 
 v.
 
 Children’s Home Society
 
 (1994) 29 Cal.App.4th 511, 550 [35 Cal.Rptr.2d 291].)
 
 [11]
 

 In the
 
 Dawley
 
 case, we found substantial evidence to support an implied finding that an agreement between persons contemplating marriage was not the result of undue influence. We stated: “Parties who are not yet married are not
 
 presumed
 
 to share a confidential relationship [citations]; the record demonstrates that Betty did not rely on the advice and integrity of James in entering into the antenuptial agreement.”
 
 (In re Marriage of Dawley, supra,
 
 17 Cal.3d at p. 355, italics added; see also
 
 La Liberty
 
 v.
 
 La Liberty, supra,
 
 127 Cal.App. at p. 673 [“The inferences of fraud and undue influence which require the courts to carefully examine a contract between a husband and wife, where one has gained an advantage over the other, do not necessarily apply to prenuptial contracts . . . .”].)
 

 
 *29
 
 Because the Uniform Act was intended to enhance the enforceability of premarital agreements, because it expressly places the burden of proof upon the person challenging the agreement, and finally because the California statute imposing fiduciary duties in .the family law setting applies only to spouses, we do not believe that the commissioners or our Legislature contemplated that the voluntariness of a premarital agreement would be examined in light of the strict fiduciary duties imposed on persons such as lawyers, or imposed expressly by statute upon persons who are married. (See Fam. Code, § 721.)
 
 [12]
 
 Nor do we find any indication that the California Legislature intended to overrule our
 
 Dawley
 
 decision. Although we certainly agree that persons contemplating marriage morally owe each other a duty of fair dealing and obviously are not embarking upon a purely commercial contract, we do not believe that these circumstances permit us to interpret our statute as imposing a
 
 presumption
 
 of undue influence or as requiring the kind of strict scrutiny that is conducted when a lawyer or other fiduciary engages in self-dealing. On the contrary, it is evident that the Uniform Act was intended to
 
 enhance
 
 the enforceability of premarital agreements, a goal that would be undermined by presuming the existence of a confidential or fiduciary relationship.
 

 Finally, the reference by the Court of Appeal majority to the state’s interest in an equal division of marital property appears misplaced in the premarital context, and its claim that the same policy interests apply to premarital agreements is flawed. We have not been directed to relevant authority establishing that the Legislature intended that premarital agreements should be examined for. fairness or enforceability on the same basis as marital settlement agreements. Instead, multiple differences in the statutes regulating each type of agreement suggest that the Legislature contemplated different standards for each type of agreement. Although community property law expresses a strong state interest in the equal division of property obtained during a marriage, so that any agreement in derogation of equal distribution should be subject to searching scrutiny for fairness, the substantive fairness of a premarital agreement is not open to examination unless the party objecting to enforcement meets the demands of Family Code section 1615, subdivision (a)(2). As explained above, with respect to division of
 
 *30
 
 property during marriage and upon dissolution of marriage, the Family Code provides that the parties stand in a confidential, fiduciary relationship to one another (Fam. Code, § 721, subd. (b)), but such a proviso does not appear in the California Uniform Act regulating premarital agreements. Marital settlement agreements must be preceded by rather elaborate disclosure of assets and liabilities, as well as income and expenses, and strict rules govern the waiver of disclosure. (Fam. Code, §§ 2100-2110;
 
 In re Marriage of Fell
 
 (1997) 55 Cal.App.4th 1058, 1064-1066 [64 Cal.Rptr.2d 522].) Such detailed requirements do not apply to premarital agreements. We are not persuaded that the policy of equal division of assets at the time of dissolution is intended to apply to premarital agreements. In sum, the Court of Appeal majority erred in suggesting that the voluntariness of a premarital agreement should be assessed on the assumption that the parties were in a confidential relationship, and in pursuit of the policy favoring equal division of assets upon dissolution.
 

 D
 

 The Court of Appeal majority, suggesting that counsel for the party who proposed the premarital agreement has a duty to provide a warning to the other party if he or she is unrepresented, stated: “Counsel, at a minimum, must explain to the unrepresented party (1) that the attorney’s responsibility is to pursue and protect only the interests of his or her client; (2) that spousal interests are probably not identical and are likely to conflict; (3) that the spouses’ interests will change over time and the attorney will not be concerned with providing for all the changed circumstances that could possibly impact the unrepresented spouse; and (4) that signing this agreement will eliminate or modify his or her statutory rights.”
 

 Both Sun and Barry contend that counsel for the represented party cannot effectively or ethically explain to the unrepresented party what rights are being waived under the agreement. Barry claims that such a warning would be unethical, because it would be inconsistent with the attorney’s duty to serve only his or her own client’s interest. Sun adds that such a rule would be improper because it would violate a rule of professional conduct prohibiting counsel for one party from giving legal advice to an opposing party who is unrepresented, in that such advice might cause the unrepresented party to believe counsel is serving both parties.
 

 We do not believe that the case before us presents an appropriate occasion to delineate the duties that must guide an attorney in drafting a premarital agreement. The issue before us is the enforceability of a premarital agreement, not the extent, if any, of counsel’s duty to an unrepresented party to
 
 *31
 
 the agreement, or the imposition of discipline upon an attorney who does not comply with that duty. We do observe, however, that it is consistent with an attorney’s duty to further the interest of his or her client for the attorney to take steps to ensure that the premarital agreement will be enforceable. After discussing the matter with his or her client, an attorney may convey such information to the other party as will assist in having the agreement upheld, as long as he or she does not violate the duty of loyalty to the client or undertake to represent both parties without an appropriate waiver of the conflict of interest. We also observe that, obviously, the best assurance of enforceability is independent representation for both parties.
 

 III
 

 Finally, we conclude that the trial court’s determination that Sun voluntarily entered into the premarital agreement in the present case is supported by substantial evidence.
 

 In determining the voluntariness of a premarital agreement, a reviewing court should accept such factual determinations of the trial court as are supported by substantial evidence. (See
 
 In re Marriage ofDawley, supra,
 
 17 Cal.3d at pp. 354-355 [undue influence is a question of fact; trial court’s finding that a party entered into a prenuptial agreement “voluntarily” implied a finding that there was no undue influence, and the finding was supported by substantial evidence];
 
 In re Marriage of Alexander
 
 (1989) 212 Cal.App.3d 677, 682 [261 Cal.Rptr. 9] [determination as to extrinsic fraud in connection with a marital settlement agreement is accepted on appeal if supported by substantial evidence];
 
 Estate of Cantor, supra, 39
 
 Cal.App.3d at p. 548 [trial court’s finding that a party knowingly waived spousal rights in a premarital agreement was supported by substantial evidence];
 
 Barker v. Barker, supra,
 
 139 Cal.App.2d at p. 211 [in a case examining the voluntariness of a premarital agreement, trial court’s determination that a party fully understood the purpose and effect of the agreement was supported by substantial evidence];
 
 La Liberty
 
 v.
 
 La Liberty, supra,
 
 127 Cal.App. at pp.
 
 613-61A
 
 [finding of knowing waiver of spousal rights in premarital agreement supported by substantial evidence].) Further, under the familiar tenets of the substantial evidence rule, “ ‘In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in [order] to uphold the [finding] if possible.’ ”
 
 (Western States Petroleum Assn. v. Superior Court
 
 (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)
 

 The Court of Appeal held the trial court erred in finding the parties’ agreement to be voluntary. The appellate court stressed the absence of
 
 *32
 
 counsel for Sun, and, strictly examining the totality of the circumstances to determine voluntariness, pointed to Sun’s limited English language skills and lack of “legal or business sophistication,” and stated that she “received no explanation of the legal consequences to her ensuing from signing the contract” and “was told there would be ‘no marriage’ if she did not immediately sign the agreement.” It also referred to typographical errors and omissions in the agreement, the imminence of the wedding and the inconvenience and embarrassment of cancelling it, and Sun’s asserted lack of understanding that she was waiving her statutory right to a community property interest in Barry’s earnings.
 

 . The trial court, however, determined that Sun entered into the premarital contract voluntarily, without being subject to fraud, coercion, or undue influence, and with full understanding of the terms and effect of the agreement. It determined that the parties did not stand in a confidential relationship.
 
 [13]
 
 The trial court declared that although, pursuant to a pretrial stipulation, the burden of proof rested upon Sun, even if the burden were to rest upon Barry, he had demonstrated by clear and convincing evidence that the agreement had been entered into voluntarily.
 

 The trial court made specific findings of fact regarding the factors we have identified as relevant to the determination of voluntariness. These findings are supported by substantial evidence and should have been accepted by the Court of Appeal majority—as they were by the dissenting justice in the Court of Appeal.
 

 The trial court determined that there had been no coercion. It declared that Sun had not been subjected to any threats, that she had not been forced to sign the agreement, and that she never expressed any reluctance to sign the agreement. It found that the temporal proximity of the wedding to the signing of the agreement was not coercive, because under the particular circumstances of the case, including the small number of guests and the informality of the wedding arrangements, little embarrassment would have followed from postponement of the wedding. It found that the presentation of the agreement did not come as a surprise to Sun, noting that she was aware of Barry’s desire to “protect his present property and future earnings,” and that she had been aware for at least a week before the parties signed the formal premarital agreement that one was planned.
 

 
 *33
 
 These findings are supported by substantial evidence. Several witnesses, including Sun herself, stated that she was not threatened. The witnesses were unanimous in observing that Sun expressed no reluctance to sign the agreement, and they observed in addition that she appeared calm, happy, and confident as she participated in discussions of the agreement. Attorney Brown testified that Sun had indicated a desire at their first meeting to enter into the agreement, and that during the discussion preceding execution of the document, she stated that she understood the agreement. As the trial court determined, although the wedding between Sun and Barry was planned for the day following the signing of the agreement, the wedding was impromptu —the parties had not secured a license or a place to be married, and the few family members and close friends who were invited could have changed their plans without difficulty. (For example, guests were not arriving from Sweden.) In view of these circumstances, the evidence supported the inference, drawn by the trial court, that the coercive force of the normal desire to avoid social embarrassment or humiliation was diminished or absent. Finally, Barry’s testimony that the parties early in their relationship had discussed their desire to keep separate their property and earnings, in addition to the testimony of Barry and Brown that they had met with Sun at least one week before the document was signed to discuss the need for an agreement, and the evidence establishing that Sun understood and concurred in the agreement, constituted substantial evidence to support the trial court’s conclusion that Sun was not subjected to the type of coercion that may arise from the surprise and confusion caused by a last-minute presentation of a new plan to keep earnings and property separate during marriage. In this connection, certain statements in the opinion rendered by the Court of Appeal majority—that Sun was subjected to aggressive threats from financial adviser Mel Wilcox; that the temporal proximity of the wedding was coercive under the circumstances of this case; and that defects in the text of the agreement indicate it was prepared in a rush, came as a surprise when presented, and was impossible to understand—are inconsistent with factual determinations made by the trial court that we have determined are supported by substantial evidence.
 

 With respect to the presence of independent counsel, although Sun lacked legal counsel, the trial court determined that she had a reasonable opportunity to obtain counsel. The trial court stated: “Respondent had sufficient awareness and understanding of her right to, and need for, independent counsel. Respondent also had an adequate and reasonable opportunity to obtain independent counsel prior to execution of the Agreement. Respondent was advised at a meeting with Attorney Brown at least one week prior to execution of the Agreement that she had the right to have an attorney represent her and that Attorneys Brown and Megwa represented Petitioner,
 
 *34
 
 not Respondent. On at least two occasions during the February 5, 1988, meeting, Respondent was told that she could have separate counsel if she chose. Respondent declined. Respondent was capable of understanding this admonition.”
 

 These factual findings are supported by substantial evidence. Brown testified that at the meeting that preceded the February 5, 1988, meeting at which the premarital agreement was executed, both Sun and Barry indicated they wished to enter into a premarital agreement, and that Brown informed Sun that he represented Barry and that therefore it might be" in her best interest to have her own attorney. She declined. Brown testified that at the February 5, 1988, session he explained the basics of community property law, telling Sun that she would be disavowing the protection of community property law by agreeing that income and acquisitions during marriage would be separate property. He informed her of her right to separate counsel, and told both parties that the agreement did not have to be signed that day. He again informed Sun that he represented Barry. He testified that Sun stated that it was not necessary for her to have counsel, and that she said she understood how the contract affected her interests under the community property law. Attorney Megwa also testified that the attorneys discussed basic community property law with Sun and told her that she had a right to have her own attorney and that she did not have to sign the agreement. He testified that the subject of her obtaining her own counsel came up at least three times during the February 5, 1988, meeting, and that she stated explicitly that she did not wish to submit the agreement to separate counsel for review. Megwa testified that he had cautioned Sun that she should not sign the agreement (which she had reviewed herself and which then had been explained to her clause by clause) unless it reflected her intentions, and that she said she understood the agreement.
 

 The Court of Appeal majority rejected the conclusion of the trial court that Sun understood why she should consult separate counsel. This determination by the appellate court contradicts the specific finding of the trial court that Sun understood what was at stake. The trial court’s finding is supported by the language of the agreement itself, including the indication in paragraph 10 that the earnings and accumulations of each spouse “during marriage” would be separate property, and additional language stating that “[w]e desire by this instrument to agree as to the treatment of separate and community property
 
 after
 
 the marriage . . . .” (Italics added.) The trial court’s finding also was supported by evidence establishing that the attorneys explained to Sun the rights she would have under community property law. In addition, Barry testified that ever since the issue first came up at the beginning of the relationship, Sun had agreed that the parties’ earnings and acquisitions
 
 *35
 
 should be separate. Further, the attorneys testified that during the February 5, 1988, meeting, Sun stated her intent to keep marital property separate. These circumstances establish that Sun did not forgo separate legal advice out of ignorance. Instead, she declined to invoke her interests under the community property law because she agreed, for her own reasons, that Barry’s and her earnings and acquisitions after marriage should be separate property.
 

 The Court of Appeal majority surmised that Sun did not have a reasonable opportunity to consult counsel because a copy of the agreement was not provided in advance of the February 5, 1988, meeting, and because Sun had insufficient funds to retain counsel and was not informed that Barry would pay for independent counsel’s services. Again, this determination is contradicted by the conclusion of the trial court that Sun had “an adequate and reasonable opportunity to obtain independent counsel prior to execution of the Agreement.” The trial court’s determination was supported by evidence that Sun had been told about the agreement and her potential need for counsel at least a week before the document was executed and that she was told at the February 5, 1988, meeting that she could consult separate counsel and was not required to sign the contract that day. Additionally, there was evidence supporting the inference that she declined counsel because she understood and agreed with the terms of the agreement, and not because she had insufficient funds to employ counsel. We agree with the dissenting justice in the Court of Appeal that the majority’s opinion departed from the appropriate standard of review in this respect. As noted above, when asked to determine whether a factual determination is supported by substantial evidence, the reviewing court should draw all reasonable inferences in
 
 favor
 
 of the judgment below. The Court of Appeal, by contrast, recounted evidence from which a number of inferences could be drawn, and incorrectly chose to draw those inferences
 
 least
 
 in favor of the judgment below.
 

 With respect to the question of inequality of bargaining power, the trial court determined that Sun was intelligent and, evidently not crediting her claim that limited English made her unable to understand the import of the agreement or the explanations offered by Barry’s counsel, found that she was capable of understanding the agreement and the explanations proffered by Barry’s attorneys. There is ample evidence to support the trial court’s determination regarding Sun’s English-language skills, in view of the circumstances that for two years prior to marriage she had undertaken employment and education in a trade that required such skills, and before meeting Barry had maintained close personal relationships with persons speaking only English. In addition, Barry and his witnesses all testified that Sun appeared to have no language problems at the time she signed the agreement.
 
 *36
 
 Brown and Megwa testified that Sun indicated at the February 5, 1988, meeting that she understood the agreement, and indeed the contract contains a paragraph indicating that the parties attest that they “fully understand!]” the terms of the agreement. The trial court’s findings with respect to the notice and opportunity Sun received to obtain independent counsel at least one week before the agreement was executed, as well as evidence indicating Sun long had known and agreed that the marriage would entail separation of earnings and acquisitions, tend to undercut any inference that coercion arose from unequal bargaining power, including Barry’s somewhat greater sophistication and the involvement of two attorneys and a financial adviser on Barry’s behalf. In addition, although these persons represented Barry, there is substantial evidence that they did not pressure Sun or even urge her to sign the agreement. Further, although Barry had three years of college studies as well as some experience in negotiating contracts, while Sun had only recently passed her high school equivalency exam (in English) and had little commercial experience, there is evidence that Barry did not understand the legal fine points of the agreement any more than Sun did. In addition, the basic purport of the agreement—that the parties would hold their earnings and accumulations during marriage as separate property, thereby giving up the protection of marital property law—was a relatively simple concept that did not require great legal sophistication to comprehend and that was, as the trial court found, understood by Sun. Finally, we observe that the evidence supports the inference that Sun was intrepid rather than a person whose will is easily overborne. She emigrated from her homeland at a young age, found employment and friends in a new country using two languages other than her native tongue, and in two years moved to yet another country, expressing the desire to take up a career and declaring to Barry that she “didn’t want his money.” These circumstances support the inference that any inequality in bargaining power—arising primarily from the absence of independent counsel who could have advised Sun not to sign the agreement or urged Barry to abandon the idea of keeping his earnings separate—was not coercive.
 

 With respect to full disclosure of the property involved, the trial court found that Sun was aware of what separate property was held by Barry prior to the marriage, and as the Court of Appeal noted, she failed to identify any property of which she later became aware that was not on the list of property referred to by the parties when they executed the contract. The trial court also determined that Sun was aware of what was at stake—of what normally would be community property, namely the earnings and acquisitions of the parties during marriage. Substantial evidence supports this conclusion, including Sun’s statements to Barry before marriage, the terms used in the contract, and Brown’s and Megwa’s testimony that they painstakingly explained this matter to Sun.
 

 
 *37
 
 With respect to the question of knowledge, as already explained it is evident that the trial court was impressed with the extent of Sun’s awareness. The trial court did not credit her claim that before the premarital agreement was presented to her, the parties never had discussed keeping their earnings and acquisitions separate during marriage. Nor did the trial court credit her claim that the subject and content of the agreement came as a surprise to her, or that she did not understand that absent the agreement, she would be entitled to share in Barry’s earnings and acquisitions during marriage. The finding that she was sufficiently aware of her statutory rights and how the agreement “adversely affected these rights” is supported by the testimony of Barry, Brown, and Megwa that the attorneys explained these matters before Sun signed the agreement. In addition, as noted, Barry testified that he and Sun agreed long before their marriage that their earnings and acquisitions would remain separate.
 
 [14]
 

 The factors we have identified in assessing the voluntariness of the agreement entered into between Barry and Sun are not rigidly separate considerations; rather the presence of one factor may influence the weight to be given evidence considered primarily under another factor. In this respect, the trial court’s finding that Sun had advance knowledge of the meaning and intent of the agreement and what was at stake for her is influential, as we have seen, in considering some of the other factors.
 

 In considering evidence that Sun responded to Barry’s suggestion that she secure independent counsel with the observation that she did not need counsel because she had nothing, the Court of Appeal majority drew the inference
 
 least
 
 in support of the judgment—namely, that this statement indicated Sun did not understand that she did have property interests at stake in the form of the community property rights that would accrue to her under applicable statutes, in the absence of a premarital agreement. We believe that this was error on the part of the appellate court, because substantial evidence supported the trial court’s determination to the contrary. It is clear from the testimony of Brown and Megwa that, even if Sun did not peruse the entire document herself, they read it to her paragraph by paragraph, thoroughly explaining the matter to her. Barry’s testimony further established that he and Sun had agreed from the beginning of their relationship that each would forgo any interest in the other’s earnings and acquisitions during marriage.
 

 Family Code section 1615 places on the party seeking to avoid a premarital agreement the burden of demonstrating that the agreement was involuntary. The trial court determined that Sun did not carry her burden, and we
 
 *38
 
 believe that its factual findings in support of this conclusion are supported by substantial evidence.
 

 IV
 

 The judgment of the Court of Appeal is reversed to the extent that it reversed the judgment of the trial court on the issue of the voluntariness of the premarital agreement. The matter is remanded to the Court of Appeal to determine whether, consistent with this opinion, its remand to the trial court for reevaluation of the termination of spousal support remains necessary, and to consider other issues it declared moot in light of its determination that the agreement was not enforceable: namely, (1) whether the trial court denied Sun due process by excluding evidence supporting her claim that Barry should be estopped from enforcing the agreement, and (2) whether the trial court erred in various respects in interpreting and enforcing the agreement.
 
 [15]
 

 Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.
 

 Appellant’s petition for a rehearing was denied October 18, 2000.
 

 [1]
 

 Primarily at issue is paragraph 10 of the agreement, which provided, in pertinent part, as follows: “Control and Earnings of Both Husband and Wife During Marriage. We agree that all the earnings and accumulations resulting from the other’s personal services, skill, efforts and work, together with all property acquired with funds and income derived therefrom, shall be the separate property of that spouse. fl[] The earnings from husband and wife during marriage shall be: [^] separate property of that spouse.” The agreement also contained provisions concerning support obligations and the disposition of property upon dissolution of the marriage, including a proviso that “Each of us shall receive free and clear of all claim of the other spouse that property which was the separate property of each spouse prior to marriage . . . and as may be later acquired as separate property.”
 

 [2]
 

 The Court of Appeal also directed that the issue of the division of property pursuant to the agreement and the issue of the duration of spousal support be retried, and affirmed the judgment regarding child support. Those issues are not before us.
 

 [3]
 

 See Stone, The Family, Sex and Marriage in England 1500-1800 (Harper 1979) pages 29-31 (in earlier times, marriage was seen in England as a “private contract between two families concerning property exchange, which also provided some financial protection to the bride in case of the death of her husband or desertion ... by him”); Note,
 
 Planning for Love: The Politics of Prenuptial Agreements
 
 (1997) 49 Stan. L.Rev. 887, 905; Younger,
 
 Perspectives on Antenuptial Agreements
 
 (1988) 40 Rutgers L.Rev. 1059, 1060; Shakespeare, Taming of the Shrew, act n, scene 1, lines 135-139.
 

 [4]
 

 See
 
 Snyder v. Webb
 
 (1853) 3 Cal. 83, 87 (parties may enter into agreement deviating from statutory provisions regarding marital property);
 
 In re Appleby’s Estate
 
 (1907) 100 Minn. 408 [111 N.W. 305, 307]; see also
 
 Brooks v. Brooks
 
 (Alaska 1987) 733 P.2d 1044, 1048-1049, footnote 4, and cases cited.
 

 [5]
 

 See
 
 Matter of Estate of Lebsock
 
 (1980) 44 Colo.App. 220 [618 P.2d 683, 685-686] (premarital agreement may be set aside for fraud or concealment, but advice of independent counsel is not a prerequisite to enforcement; parties should have some understanding of their rights and of the assets of the other party);
 
 Hafner v. Hafner
 
 (Minn. 1980) 295 N.W.2d 567, 571 (observing, in enforcing an agreement, that the party challenging the agreement was reasonably intelligent and experienced, though lacking much formal education, and that she was aware of the intent of the agreement);
 
 In re Marriage of Coward
 
 (1978) 35 Or.App. 677 [582 P.2d 834, 835-836] (noting, among other factors, that the agreement had been discussed prior to the engagement and that both parties were experienced in the business world and fully aware of the intent of the agreement);
 
 Lutgert v. Lutgert, supra,
 
 338 So.2d at pages 1113-1117 (agreement “sprung” on a reluctant and objecting prospective wife at jeweler’s shop the day of the wedding and a planned cruise; the only legal advice came from prospective husband’s attorneys; the agreement was grossly disproportionate, and the prospective husband had far greater bargaining power);
 
 Del Vecchio v. Del Vecchio
 
 (Fla. 1962) 143 So.2d 17, 19-21 (a voluntary agreement may be enforced even if it appears unfair, if the party seeking enforcement proves that the burdened party had knowledge of the other party’s assets and of the rights being waived);
 
 In re Kaufmann’s Estate, supra,
 
 171 A.2d at pp. 50-51 (agreement enforced in light of full disclosure and knowledge of the financial status of the other party).
 

 [6]
 

 See cases cited in footnote 5,
 
 ante.
 

 [7]
 

 See Civil Code section 1670.5, based upon section 2-302 of the Uniform Commercial Code;
 
 Perdue
 
 v.
 
 Crocker National Bank
 
 (1985) 38 Cal.3d 913, 925, footnote 10 [216 Cal.Rptr. 345, 702 P.2d 503]; see also the Restatement Second of Contracts, section 208.
 

 [8]
 

 See Senate Committee on Judiciary, Report on Senate Bill No. 1143 (1985-1986 Reg. Sess.) page 2; Assembly third reading digest of Senate Bill No. 1143 (1985-1986 Reg. Sess.), as amended August 28, 1985, page 3.
 

 [9]
 

 The few state courts that have applied the Uniform Act after its adoption in their particular states have not examined closely the voluntariness requirement. One decision, in which the party challenging the agreement did not contend that he entered into it involuntarily, conflates the procedural and substantive fairness elements of unconscionability and, with respect to the requirement of procedural fairness, examines the relative age and sophistication of the parties and the absence of fraud, duress, or overreaching.
 
 (Marsh v. Marsh
 
 (Tex.App.1997) 949 S.W.2d 734, 741-742.) With little discussion, that decision rejected claims that the imminence of the wedding and the absence of independent counsel should render the agreement unenforceable, and refused to accept the objecting party’s failure to read the agreement as a ground for voiding it.
 
 (Id.
 
 at p. 741.) In a Rhode Island case applying that state’s version of the Uniform Act, the voluntariness of the agreement was conceded
 
 (Penhallow v. Penhallow
 
 (R.I. 1994) 649 A.2d 1016, 1021-1022), and under that state’s particular enactment an agreement is unenforceable only if it is
 
 both
 
 involuntary and unconscionable. One court has referred to inequality of bargaining power and of sophistication between the parties, and identified knowledge of what is being relinquished as an element of voluntariness. (See
 
 Matter of Estate of Lutz
 
 (1997) 1997 N.D. 82 [563 N.W.2d 90, 97-98] [indicating that the presence of independent counsel is the best indication that the disadvantaged party understood the effect of the agreement].)
 

 [10]
 

 See, for example,
 
 In re Marriage of Spiegel, supra,
 
 553 N.W.2d 309, 317-318 (voluntariness depends in part upon an intentional relinquishment of a known right; the proximity of the wedding, a threat not to wed without an agreement, and embarrassment over the potential cancellation of the wedding do not constitute duress or undue influence, particularly because the party attacking the agreement was intelligent and educated and had the advice of independent counsel);
 
 Lebeck v. Lebeck
 
 (1994) 118 N.M. 367 [881 P.2d 727, 732-734] (shortness of time between agreement and wedding and desire of woman to marry to legitimize a child are not alone enough to establish involuntariness; wife failed to carry burden of proof of involuntariness in that she was 34 years of age, worked as a professional, had independent counsel, and understood the agreement, and the “threat” not to marry without the agreement does not constitute duress but is a legitimate objective);
 
 Pick v. Pick
 
 (1993) 109 Nev. 458 [851 P.2d 445, 449] (voluntariness depends upon the opportunity to consult independent counsel, the absence of coercion, the business acumen of the parties, the parties’ awareness of each other’s assets, and the parties’ understanding regarding the rights being forfeited);
 
 Lee
 
 v.
 
 Lee
 
 (1991) 35 Ark.App. 192 [816 S.W.2d 625, 627-628] (although the wedding was soon to occur, there was no pressure to sign the agreement; husband’s desire to maintain separate property had been discussed in advance; assets were disclosed, and the failure of the party challenging the agreement to read it before signing was no excuse);
 
 Tiryakian v. Tiryakian
 
 (1988) 91 N.C.App. 128 [370 S.E.2d 852, 854] (premarital agreement was involuntary because of proximity of wedding and because there was no disclosure of assets, no knowledge of the effect of the agreement, and no independent counsel).
 

 [11]
 

 Under California law, even in the absence of a confidential or fiduciary relationship, a contract may be void if the person seeking relief proves undue influence. (See Civ. Code, § 1575.) In such circumstances, the plaintiff must prove that the defendant took unfair advantage of the plaintiffs weakness of mind or “grossly oppressive and unfair advantage of another’s necessities or distress.”
 
 (Ibid.)
 
 The court hearing such a claim will consider matters such as the substantial weakness of the person influenced or the excessive strength of the other party, taking into account factors such as the transaction having occurred at an unusual or inappropriate time or place, an insistent demand that the business be concluded immediately without recourse to independent advisers and an extreme emphasis on the negative consequences of delay, the concurrence of several persons in influencing the weaker party, and the absence of an independent adviser for that person.
 
 (Odorizzi v. Bloomfield School Dist.
 
 (1966) 246 Cal.App.2d 123, 133 [54 Cal.Rptr. 533]; 1 Witkin, Summary of Cal. Law,
 
 supra,
 
 Contracts, § 428, pp. 384-385.)
 

 [12]
 

 A North Dakota case decided after that state’s adoption of the Uniform Act referred to the possibility that an agreement to marry may create a fiduciary relationship, but that decision did not impose any presumption of undue influence.
 
 (Matter of Estate of Lutz, supra,
 
 563 N.W.2d at p. 98.) Another case interpreting an agreement under the Uniform Act did not discuss the confidential relationship doctrine, but clearly placed the burden of establishing
 
 every
 
 fact relevant to a determination of voluntariness upon the person attacking the agreement.
 
 (Marsh
 
 v.
 
 Marsh, supra,
 
 949 S.W.2d at p. 739; see also
 
 Penhallow
 
 v.
 
 Penhallow, supra,
 
 649 A.2d at p. 1021 [referring to the heavy burden of proof placed by the Uniform Act upon the person seeking to avoid the agreement].)
 

 [13]
 

 Sun claimed that she demonstrated that a confidential relationship actually existed, through evidence of her financial dependence on and trust in Barry and her testimony that she entered into the agreement under a misapprehension as to its meaning. The trial court’s contrary finding is supported by evidence, noted below, that Sun had her own career plans, that the parties long had planned to keep their earnings and acquisitions separate, and that Sun understood the contract and entered into it because it reflected her intent.
 

 [14]
 

 Sun’s contention that she could not have understood the agreement because it contained typographical errors and omitted a schedule of Barry’s separate property is inconsistent with the trial court’s determination that she did understand the agreement, including its application to premarital separate property, a determination supported by substantial evidence.
 

 [15]
 

 Specifically, with respect to the second issue, Sun claimed in the Court of Appeal that in applying the premarital agreement, the trial court erred in interpreting the effect of the parties’ failure to complete community property schedules, in determining whether certain purchases constituted a gift to the community or a transmutation pursuant to the premarital agreement, and in calculating any right to reimbursement for separate property contributions to jointly held property.