# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00395-CV

John Thomas Izzo, Appellant

v.

Sharon Diane Izzo, Appellee

FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 425TH JUDICIAL DISTRICT
NO. 07-2606-F425, HONORABLE J. F. CLAWSON JR., JUDGE PRESIDING

## MEMORANDUM OPINION

Appellant John Thomas Izzo appeals from the final decree in his divorce proceeding from appellee Sharon Diane Izzo.[1]  He also appeals from the trial court's order sustaining Sharon's challenge to a post-marital property agreement between the parties.  We affirm both the divorce decree and the order finding the post-marital property agreement unenforceable.

## BACKGROUND

The parties met in the spring of 2002, approximately one month after John started his own law practice.  Sharon, who was working as a counselor at the time, owned a residence on Anacacho Cove in Round Rock (the "Anacacho Cove residence"), and had invested an inheritance of around $180,000 to $200,000 in mutual funds.  At the hearing on her challenge to the post-marital

---

[1]  We will refer to the parties by their first names to avoid confusion.

property agreement (the "enforceability hearing"), Sharon testified that in the fall of 2002, John advised her that "investing in real estate or real property was much better than mutual funds" and that her money "would be better used and invest[ed] in a piece of property where a law firm would be situated." John testified that this discussion took place because Sharon was concerned that mutual funds were a risky investment, leading him to suggest that she invest in real estate instead. On March 12, 2003, Sharon and John formed an entity called Federalist Investments, L.L.C. ("Federalist") for the purpose of purchasing land and constructing an office building that would house John's law firm, with the remaining office space being leased to tenants. Sharon invested $80,000 in exchange for 80,000 shares in Federalist, and John invested $5,000 in exchange for 5,000 shares. Federalist then purchased real property on South Mays in Round Rock (the "South Mays property") for approximately $180,000, and constructed an office building on the site at a construction cost of approximately $525,000.[2] The parties were married on April 26, 2003. Construction on the South Mays property was completed in 2005.

In January 2004, Sharon deeded the Anacacho Cove residence to John. Both parties testified that this was done for the purpose of refinancing the home. According to John, Sharon deeded him the property because his credit rating was needed to accomplish the refinance. In

---

[2] At the enforceability hearing, John estimated the fair market value of the South Mays property to be between $700,000 and $900,000, and Federalist's remaining debt on the property to be $500,000. The appraisal district records list the value of the South Mays property as $821,833 in 2006. Based on this evidence, the trial court made a finding that the property's value exceeded $800,000 at the time the agreement was executed, so that Federalist had approximately $300,000 in equity at that time. At the hearing, John estimated the gross rent received by Federalist from its tenants to be approximately $5,000 per month. John's law firm did not pay rent for its office space in the building.

September 2004, the parties used the Anacacho Cove residence as collateral to purchase two lots in the Gabriels Overlook development in Georgetown, Texas (the "Gabriels Overlook lots"). These lots were fully paid off at the time of the parties' divorce decree. John testified that he used income from his law practice to make the down payments and to subsequently pay off the Gabriels Overlook lots.[3]

In the summer of 2006, John directed an associate at his firm to draft a post-marital property agreement dividing the property owned by the parties. The agreement included a sales provision stating that Sharon would transfer her 80,000 shares in Federalist to John in exchange for an $80,000 note, to be paid over the course of ten years at a rate of 4.2% interest. As a result, John would be the sole owner of Federalist, which in turn owned the South Mays property. The agreement further designated the Anacacho Cove residence as Sharon's separate property. With respect to the parties' marital estate, the agreement designated all of the community property as John's separate property, with the exception of personal property subject to Sharon's sole control and her counseling practice worth approximately $7,500. John would receive his law practice, which he valued at approximately $778,000 shortly after the agreement was executed, personal property subject to his sole control, and both of the Gabriels Overlook lots.[4] At the time the agreement was

---

[3] Had the terms of the post-marital property agreement been enforced, the income used to pay off the lots after the effective date of the agreement would have been considered John's separate property, while the down payment and any payments made prior to the effective date of the agreement would have been community property. Because the trial court ruled that the post-marital agreement was unenforceable, the law firm income used to make the down payment and all subsequent payments on the lots was considered community property.

[4] John strongly disputes the trial court's finding that his firm exceeded $750,000 in value at the time the agreement was signed. This issue is discussed in more detail below.

3

executed, the down payment and all subsequent payments on the Gabriels Overlook lots had been made with community funds. Thus, the terms of the agreement gave John over $800,000 in community property, while Sharon would receive approximately $7,500 in community property.[5]

At the enforceability hearing, the trial court heard testimony regarding the circumstances surrounding the parties' execution of the agreement. Sharon testified that John led her to believe the marriage could not continue unless she signed the agreement, stating that she only did so in order to alleviate the pressure from John. In addition, both parties testified to Sharon's fear that she would lose her $80,000 investment in Federalist unless she signed the agreement. When asked if she executed the agreement of her own free will, Sharon answered, "Yes, I did, but under great duress. I did not want to sign it." When asked whether she did so voluntarily, she answered, "No, I did not."

Because the agreement required the signature of an attorney on Sharon's behalf, Sharon took the agreement to two different attorneys before signing it. The first attorney, after reviewing the agreement, declined to sign it. Sharon then went to the office of Patricia Brown, a friend of both John and Sharon, on August 16, 2006. Sharon testified that she did not have an appointment with Brown, but that she showed up at Brown's office in the middle of the day, upset and crying. Brown provided the following testimony about her meeting with Sharon:

---

[5] In connection with its order finding the marital property agreement unenforceable, the trial court made a finding of fact that the Gabriels Overlook lots had $100,000 in equity as of August 2006. It is unclear how the trial court reached this calculation. Based on John's testimony at the enforceability hearing, it would appear that the equity in the lots at that time was closer to $40,000. For purposes of calculating the total value of community property awarded to John in the agreement, we will assume an equity amount of $40,000.

4

She appeared to be very upset. She cried a good bit during that appointment and she seemed to me to be compelled to sign it no matter what I said about it. I wouldn't have any way to really ascertain whether the document was fair or not without having a whole lot more information about their estate than I had at that time, but from what she indicated to me about what she had brought into the marriage, it would seem to favor John, and I asked her why she would sign it, and she said, "You don't understand, I have to sign it to make the pressure stop at home." And it seemed to me that she was going to sign it pretty much no matter what I said to her. She was quite upset.

Brown further testified that she was not provided with any records or disclosures regarding the Izzos' finances. While Brown testified that she advised Sharon not to sign the agreement, both Sharon and Brown signed the agreement before Sharon left the office.

At the enforceability hearing, the parties agreed that the value of Sharon's counseling practice was approximately $7,500. The value of John's law firm, however, was disputed.[6] In December 2006, four months after the post-marital property agreement was signed, another attorney at the firm, Scott Heselmeyer, purchased a 45% interest in the firm in exchange for a $350,000 note, to be paid off over a 30-year term. Under the terms of the agreement, John would retain a 55% interest in the firm, representing a value of $428,000. John testified that these negotiations do not indicate that the firm had a total value of $778,000 in December 2006, stating, "Scott has since left the law firm basically saying he made a bad deal and it wasn't worth that." On cross-

---

[6] The parties agree that the value of John's firm increased significantly after the marriage. John's income tax statement from 2002, the year before the parties married, indicates that his net earnings from his law practice that year were $51,680. He testified that in subsequent years, his earnings were in the hundreds of thousands of dollars. Sharon also testified that John's earnings from practicing law grew substantially during the marriage, stating, "[A]s his law firm grew, I sent him a lot of clients, some of his bigger clients."

examination, John acknowledged that at the time the negotiations were made and Heselmeyer agreed to pay $350,000 for a 45% interest in the firm, Heselmeyer had access to all of the firm's financial books and records. According to Heselmeyer's testimony, he was actually responsible for the firm's financial accounting from 2003 until the time he left the firm. In addition, John testified that Heselmeyer worked on the firm's contingency-fee cases and received "fairly large bonuses" when certain cases were settled, suggesting that Heselmeyer was familiar with the potential value of the firm's pending cases. John further explained that Heselmeyer's $350,000 note had since been forgiven.

John filed for divorce in November 2007 and sought to enforce the terms of the post-marital property agreement. Sharon filed a counter-petition for divorce, alleging, among other things, involuntariness, unconscionability, and breach of fiduciary duty. The trial court conducted a bifurcated trial on the enforceability of the agreement and ultimately issued an order sustaining Sharon's challenge to the agreement. In support of its order, the trial court made the following findings of fact and conclusions of law:

FINDINGS OF FACT

1. Prior to their marriage Mr. I[zz]o[7] became Sharon May's attorney, and Investment Advisor, and took possession of $80,000.00 of her assets.

2. Izzo invested May's $80,000 in a LLC, and allocated 80% of the Equity in the company to her and 20% to himself, although his investment was only $5,000.00, all before they were married.

---

[7] While the remainder of the findings of fact and conclusions of law refer to John as "Mr. Isso," and at times refer to Sharon as "Mrs. Isso," we will substitute the correct spelling of "Izzo."

6

3.	The LLC prospered under Mr. Izzo's management, and attained a value of over $800,000.00 with debt of approximately $500,000.00.

4.	Mr. Izzo's law practice grew during the marriage from a start-up nominal value to a value of at least $750,000.00 at the time of the execution of the agreement in question.

5.	Mr. Izzo invested community funds in 2 residential lots in which there was at least a $100,000.00 equity in August 2006.

6.	Mr. Izzo presented Sharon Izzo with a proposed marital agreement which not only awarded her only a token share of the community assets, but also required her to convey her separate property to him for a grossly inadequate consideration.

7.	Mr. Izzo subjected Sharon Izzo to extreme and unreasonable pressure and duress in order to coerce her into signing the agreement.

8.	Mr. Izzo did not advise Mrs. Izzo of the value of any of the community property or of the value of her separate property equity in the LLC.

9.	At some point Mrs. Izzo became convinced that she would be lucky to get her original investment back, and allowed Mr. Izzo to treat her investment as a loan.

10.	Sharon Izzo signed the marital agreement under extreme duress from Mr. Izzo.

11.	Even though Mr. Izzo decided to treat Mrs. Izzo's investment as a loan, he did not offer any interest for the years her money was invested; nor did he offer a reasonable rate of interest on the deferred repayment; nor did he secure the note with a security agreement on the shares representing 80% of the LLC.


CONCLUSIONS OF LAW

1.	At the time Mr. Izzo became attorney, investment advisor and custodian of Sharon May's funds a fiduciary relationship arose, incident to which Mr. Izzo undertook the duties the law imposes upon the fiduciary.

2.	The subsequent marriage of the parties did not relieve Mr. Izzo of the duties implicit in the fiduciary relationship.

3. Mr. Izzo violated his fiduciary duties to Mrs. Izzo in all the particulars set forth in fact findings No's. 6, 7, 8, 9, & 11.

4. Section 4.102 of the Texas Family Code does not provide for divesting a spouse of his or her separate property, but contemplates being used to convert community property to separate property.

5. Through the misuse of the foregoing statute, Mr. Izzo attempted to deprive Mrs. Izzo of substantial amounts of separate and community property to the extent of several hundreds of thousands of dollars.

6. The proposed "marital agreement" prepared by Mr. Izzo and forced upon Mrs. Izzo was unconscionable[] when it was signed.

7. Mrs. Izzo did not sign the agreement voluntarily, but under extreme duress, coercion[,] and out of desperation.

8. Mrs. Izzo was not provided a fair and reasonable disclosure of the property or financial obligations of Mr. Izzo.

9. Mrs. Izzo did not voluntarily and expressly waive, in writing[,] any right to disclosure of the property or financial obligations of Mr. Izzo.

10. Mrs. Izzo did not have, or reasonably could not have had, adequate knowledge of the property or financial obligations of Mr. Izzo.

In March 2009, the trial court conducted a separate trial on the divorce. In the final divorce decree, the trial court divided the community property by awarding John his law practice, a motor vehicle, and personal property subject to his sole control. Sharon was awarded her counseling business, a motor vehicle, personal property subject to her sole control, and the Gabriels Overlook lots. The trial court also confirmed 80,000 shares of Federalist as Sharon's separate property and 5,000 shares of Federalist as John's separate property. The trial court further confirmed the Anacacho Cove residence as Sharon's separate property and an additional motor vehicle as John's separate property. In findings of fact issued after the divorce decree, the trial court

8

determined that as of the date of the divorce, the value of Sharon's counseling business was $7,500, the value of John's law practice was at least $500,000, and the combined value of the Gabriels Overlook lots was $106,041.96.

John now appeals from both the order sustaining Sharon's challenge to the enforceability of the post-marital property agreement and the final decree of divorce.

## STANDARD OF REVIEW

The party challenging the enforceability of a marital property agreement bears the burden of proving the agreement was involuntary or unconscionable. *See* Tex. Fam. Code Ann. § 4.105 (West 2006); *Pletcher v. Goetz*, 9 S.W.3d 442, 445 (Tex. App.—Fort Worth 1999, pet. denied) (op. on reh'g). Whether a party executed an agreement voluntarily is a question of fact dependent upon all the circumstances and the mental effect on the party claiming involuntary execution. *Martin v. Martin*, 287 S.W.3d 260, 263 (Tex. App.—Dallas 2009, pet. denied). As a reviewing court, we may not substitute our judgment for that of the trial court with respect to the resolution of factual issues committed to the trial court's discretion. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992). In resolving factual issues, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Raymond v. Rahme*, 78 S.W.3d 552, 556 (Tex. App.—Austin 2002, no pet.).

The trial court has broad discretion in dividing the marital estate at divorce. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). On appeal, we presume that the trial court exercised this discretion properly and will reverse the cause only where there is a clear abuse of discretion. *See Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974). A clear abuse of discretion is shown

9

only if the division of the property is manifestly unjust. *See Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980). "The party attacking the property division bears the heavy burden of showing that the trial court's property division was not just and right." *Pletcher*, 9 S.W.3d at 446.

## DISCUSSION

While John raises 57 points of error on appeal, these points can be generally summarized as two distinct issues.[8] First, he argues that the trial court erred in finding the post-marital property agreement to be unenforceable, challenging each of the findings of fact and conclusions of law issued in support of this determination. Second, he argues that the trial court's division of property in the final decree of divorce was "grossly disproportionate" and a clear abuse of discretion. In support of this argument, John challenges the trial court's finding that his law firm had a value of at least $500,000 at the time of the divorce.

*I.       Post-Marital Property Agreement*

Chapter 4 of the Texas Family Code governs premarital and post-marital property agreements. *See* Tex. Fam. Code Ann. §§ 4.001-.206 (West 2006). Section 4.102 allows spouses

---

[8] In his initial brief on appeal, John also raised a point of error arguing that the trial court erred in failing to file findings of fact and conclusions of law in support of the divorce decree. Based on the supplemental clerk's record and John's supplemental brief, it appears that findings of fact and conclusions of law were in fact filed. This point of error is therefore moot.

John also raises a point of error arguing that Sharon ratified the post-marital property agreement by accepting payments from John pursuant to the provision governing the sale of her interest in Federalist. Ratification is an affirmative defense and must be pleaded to avoid waiver. *Petroleum Anchor Equip., Inc. v. Tyra*, 419 S.W.2d 829, 834 (Tex. 1967). Because John did not raise the issue of ratification until his motion for new trial, this point of error has been waived. *See id.*

to enter into agreements for the partition or exchange of community property into separate property. *Id.* § 4.102. In challenging the enforceability of the parties' post-marital agreement, Sharon invoked family code section 4.105, which states:

> (a)  A partition or exchange agreement is not enforceable if the party against whom enforcement is requested proves that:
>
>> (1)  the party did not sign the agreement voluntarily; or
>>
>> (2)  the agreement was unconscionable when it was signed and, before execution of the agreement, that party:
>>
>>> (A)  was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>>>
>>> (B)  did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>>>
>>> (C)  did not have, or reasonably could not have had, adequate knowledge of the property or financial obligations of the other party.
>
> (b)  An issue of unconscionability of a partition or exchange agreement shall be decided by the court as a matter of law.
>
> (c)  The remedies and defenses in this section are the exclusive remedies or defenses, including common law remedies or defenses.

*Id.* § 4.105.

In sustaining Sharon's challenge, the trial court found that she had satisfied her burden of proof on both of the available grounds for invalidating an agreement under section 4.105—involuntariness and unconscionability. *See id.* Because only one ground is necessary to satisfy section 4.105, the trial court's order may be affirmed if Sharon has satisfied her burden of proof on either involuntariness or unconscionability.

11

*Involuntary Execution*

A partition or exchange agreement under family code section 4.105 is not enforceable if the party challenging enforcement establishes that he or she did not sign the agreement voluntarily. *Id.* While section 4.105 does not define "voluntarily," courts have "generally construed it to mean an action that is taken intentionally or by the free exercise of one's will." *Martin*, 287 S.W.3d at 263. "Generally, whether a party executed an agreement voluntarily . . . is a question of fact dependent upon all the circumstances and the mental effect on the party claiming involuntary execution." *Id.*

Because the existence of a fiduciary relationship between the parties is relevant to our analysis of whether the property agreement was executed involuntarily, particularly the mental effect on Sharon as the party claiming involuntary execution, we will begin our analysis by reviewing the trial court's finding that a fiduciary duty arose between the parties when John acted as Sharon's attorney, investment advisor, and custodian of her funds prior to the marriage.

At the time the parties formed Federalist for the purpose of developing commercial property, Sharon was employed as a counselor, and there is no indication that she had any professional background in real estate development or finance. John was a practicing attorney and had previously worked for two or three years at a commercial real estate company.[9] According to

---

[9] John testified that he gained no financial knowledge while working at the commercial real estate company because he simply "dealt with personnel and things like[] that." His testimony on cross-examination suggests that this assertion conflicts with representations he made on Federalist's loan applications to the Small Business Administration regarding his background in the securities and investment industry.

Sharon, the formation of Federalist came about when John suggested that she move her investments out of mutual funds and into a commercial property venture with him. Specifically, Sharon testified:

> [H]e said that investing in real estate or real property was much better than mutual funds because you never knew what the market was going to do and real estate was much more stable and that my money would be better used and investing in a piece of property where a law firm would be situated would give me much better return for my money.

John also testified that he came to Sharon with the idea of investing her inheritance in commercial property rather than mutual funds. He further testified that his plan was to utilize the commercial property to house his law firm and lease out the remainder of the building. John disagreed, however, with Sharon's testimony that he told her real property would yield a better return than mutual funds, stating, "I simply told her that I thought real estate was safer." At any rate, based on John's advice, Sharon invested $80,000 in Federalist in exchange for an 80% interest. John received a 20% interest, despite having invested only $5,000, or approximately 6% of the original capital. The formation documents for Federalist were drawn up by Heselmeyer, who was then an associate in John's law firm. Federalist's articles of organization identify John as the organizer of the entity.

An attorney-client relationship may be implied from the actions of the parties, *see Bright v. Addison*, 171 S.W.3d 588, 596 (Tex. App.—Dallas 2005, pet. denied), and does not depend on the payment of a fee, *see Prigmore v. Hardware Mut. Ins. Co.*, 225 S.W.2d 897, 899 (Tex. Civ. App.—Amarillo 1949, no writ). In organizing Federalist and managing the drafting of the formation documents, John provided Sharon with the legal services typically related to entity formation.

13

Sharon, by signing the formation documents created at John's direction, manifested her intent to receive those services. *See MacFarlane v. Nelson*, No. 03-04-00488-CV, 2005 Tex. App. LEXIS 7681, at *13 (Tex. App.—Austin Sept. 15, 2005, pet. denied) (mem. op.) (citing Restatement (Third) of the Law Governing Lawyers § 14 (2000)) (attorney-client relationship is implied when both attorney and client manifest their intent that legal services will be provided).

Based on this record, there is sufficient evidence to support the trial court's finding of fact that John became Sharon's attorney, investment advisor, and custodian of her assets prior to the parties' marriage. As a result, we also agree with the trial court's conclusion that John owed Sharon a fiduciary duty that arose prior to the parties' marriage. *See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (holding that fiduciary duties arise as matter of law in certain formal relationships, including attorney-client and trustee relationships); *Western Reserve Life Assurance Co. v. Graben*, 233 S.W.3d 360, 373 (Tex. App.—Fort Worth 2007, no pet.) (upholding finding of existence of fiduciary relationship between investment advisor and clients in light of formal relationship of principal and agent).

Significantly, the fiduciary duty John owed to Sharon in acting as her attorney and investment advisor is independent from the general fiduciary duty that he owed to Sharon as her spouse, a duty which this Court has previously held to be insufficient, standing alone, to raise a fact issue on involuntary execution of a marital property agreement. *See Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 701 (Tex. App.—Austin 2005, pet. denied) (stating that despite fiduciary duty between spouses, "the legislature manifested the strong policy preference that voluntarily made marital property agreements be enforced"). Nevertheless, it is worth noting that even if the only fiduciary responsibility in this case arose from the general duty between spouses, such a duty would

14

remain relevant to our analysis of the statutory affirmative defenses to enforcement of a post-marital property agreement. *See Marsh v. Marsh*, 949 S.W.2d 734, 740 n.4 (Tex. App.—Houston [14th Dist.] 1997, no writ) (noting that statutory defenses for both premarital and post-marital agreements are identical, but that "in post-marital agreements a fiduciary duty exists that is not present in premarital agreements between prospective spouses"); *see also* Thomas M. Featherston, Jr. & Amy E. Douthitt, *Changing the Rules by Agreement: The New Era in Characterization, Management, and Liability of Marital Property*, 49 Baylor L. Rev. 271, 314 (1997) ("Both the formalities required and the rules of enforcement for marital agreements are essentially the same as for premarital agreements. . . . On the other hand, [post-marital] agreements may be particularly susceptible to charges of involuntariness and unconscionability, because of the relative positions of the parties.").[10] The fiduciary duty between spouses extends to a duty to disclose material information in business transactions, as one Texas court has held that where spouses signed an agreement covering the disposition of their stock in a company for which one of the spouses was a founder, officer, and director, the spouse with "an insider's knowledge of the affairs and prospects" of the company had a fiduciary duty to deal fairly with the other spouse in acquiring from her any

---

[10] The fiduciary duty between spouses terminates during contested divorce proceedings in which both parties are represented by counsel. *See Solares v. Solares*, 232 S.W.3d 873, 881 (Tex. App.—Dallas 2007, no pet.). However, this rule of automatic termination is inapplicable to this case, as it is undisputed that the parties executed the agreement prior to any divorce proceedings. This Court has declined to adopt "a categorical rule that spouses who hire separate counsel to negotiate a property division can never owe fiduciary duties to one another." *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 701 n.21 (Tex. App.—Austin 2005, pet. denied). Even if such a rule did apply, the record reflects that Brown, the attorney who signed the post-marital agreement as Sharon's counsel, did not actually "negotiate" the property division, but merely reviewed the completed agreement and in fact advised Sharon not to sign it. In any event, as previously discussed, the fiduciary duty John owed to Sharon goes above and beyond the general fiduciary relationship between spouses because he acted as Sharon's attorney and investment advisor in connection with her investment in Federalist.

15

rights in the stock, including a duty to disclose the true value of the company. *Miller v. Miller*, 700 S.W.2d 941, 945-46 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (citing *Johnson v. Peckham*, 120 S.W.2d 786, 787-88 (Tex. 1938) (holding that partner has "absolute duty to disclose" to co-partner, whose interest he was purchasing, all important information as to value)). The existence of a duty to disclose material facts is even more compelling in the present case, where John was acting in a fiduciary capacity separate and apart from his fiduciary obligation as Sharon's spouse.

Having determined that John owed Sharon a fiduciary duty as her attorney and investment advisor in addition to the fiduciary duty that generally exists between spouses, we now review the evidence for support of the trial court's conclusion that John breached this duty. The fiduciary obligation imposes a duty to exercise good faith and candor, to disclose all relevant information, and to refrain from using the relationship to benefit the fiduciary's personal interest, except with full knowledge and consent of the principal. *See, e.g.*, *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942); *Chien v. Chen*, 759 S.W.2d 484, 495 (Tex. App.—Austin 1988, no writ); *see also Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (stating that fiduciary relationship between attorneys and clients requires "absolute perfect candor, openness and honesty, and the absence of any concealment or deception"). In this case, John advised Sharon to invest $80,000 in Federalist, a real estate development company in which he would own a minority interest. At a later date, once Federalist's property holdings had dramatically increased in value, John persuaded Sharon to sign a marital property agreement requiring her to sell her interest in Federalist to him for the $80,000 she

had originally invested. As the trial court accurately pointed out, this arrangement turned Sharon's $80,000 investment into an interest-free loan that provided great financial benefit to John.[11]

The record reflects that at the time Sharon contributed $80,000 to Federalist, both she and John viewed that contribution as an investment. Both parties testified that Sharon invested in Federalist because she wanted to transfer her inheritance out of mutual funds and into real estate. According to Sharon's testimony, John persuaded her to invest in Federalist by explaining that her money would be safer there than in mutual funds. After convincing Sharon to invest her funds in this manner, John later pressured her to sign an agreement that would retroactively transform her investment into an interest-free loan for the time period beginning with the capitalization of Federalist in early 2002 and ending with the execution of the agreement in August 2006. The promissory note that resulted from the marital property agreement was a ten-year, unsecured note with an annual interest rate of 4.2%, a rate the trial court described as "unconscionably low."

Sharon testified at the enforceability hearing that with respect to her initial investment in Federalist, it "was [John's] idea to turn it into a loan." She further stated that she signed the post-marital agreement, which provided for the sale of her interest in Federalist, because she was afraid that if she did not, she would lose the $80,000 that she had initially invested.[12] The parties' marital

---

[11] A transaction between a fiduciary and his principal is considered unfair if the fiduciary significantly benefits from it at the expense of the principal as viewed in the light of the circumstances existing at the time of the transaction. *See Miller v. Miller*, 700 S.W.2d 941, 947 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (citing *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964)).

[12] Federalist had approximately $300,000 in equity in the South Mays property at the time the agreement was executed. *See supra* note 2.

17

therapist also testified to her understanding that Sharon thought she was in danger of losing her $80,000 investment in Federalist.

This evidence supports the trial court's finding of fact that "[a]t some point [Sharon] became convinced that she would be lucky to get her original investment back, and allowed [John] to treat her investment as a loan." The trial court elaborated on this finding at the enforceability hearing, stating:

> [T]he circumstances presented here in court indicate a course of action calculated to involve her funds in Mr. Izzo's business[] or his professional practice and perhaps then putting it in as an investment and encouraging her to regard that as an investment and then to somehow create a mental state on her part where she begins to be willing to accept . . . a refund of her money over a long period of time at an unconscionably low rate of interest simply because she is concerned for the safety of her funds.[13]

In inducing Sharon to believe that she was at risk of losing her initial $80,000, John failed to disclose the value of Federalist, which at that time had approximately $300,000 worth of equity in the South Mays property. He then purchased Sharon's shares with an $80,000 note at a low rate of interest that was not secured by a security interest in the company. In entering into this business arrangement with John, Sharon relied on him to exercise the good faith and candor required of a fiduciary. *See generally Horton v. Robinson*, 776 S.W.2d 260, 265 (Tex. App.—El Paso 1989, no writ) (affirming jury finding of breach of fiduciary duty in case where appellee went into business

---

[13] The trial court also noted on the record that John "is somewhat lacking in credibility because his memory seems to be selective and to be conveniently self-serving" and because he is "an uncomfortable witness on the stand." The trial court further noted that Sharon appeared credible, describing her as a "forthcoming witness."

18

with attorney and friend, stating, "A layman would be expected to rely upon one who was an attorney when a new business was started, particularly where they were long-time friends and an attorney-client relationship had previously existed."). While acting as a fiduciary in connection with Sharon's investment in Federalist, John persuaded her to execute an agreement that provided a financial windfall to him at Sharon's expense. As such, we cannot conclude that John exhibited the good faith and candor required of a fiduciary in conducting this transaction. Therefore, we hold that the evidence is sufficient to uphold the trial court's finding that John breached his fiduciary duty to Sharon.

John's formal fiduciary relationship with Sharon as her attorney and investment advisor, his subsequent breach of fiduciary duty, and the benefits he received as a result of that breach, particularly the transformation of Sharon's investment in the real property venture into an interest-free loan for his benefit, trigger a presumption of undue influence in connection with the marital property agreement. "Whenever a fiduciary receives a benefit or makes a profit from transactions with his principal . . . , a presumption of fraud, unfairness or undue influence arises." *Dozier v. Dozier*, No. A14-87-00130-CV, 1988 Tex. App. LEXIS 1163, at *20 (Tex. App.—Houston [14th Dist.] May 26, 1988, writ denied) (not designated for publication); *see also Pace v. McEwen*, 574 S.W.2d 792, 796 (Tex. App.—El Paso 1978, writ ref'd n.r.e.) (holding that because fiduciary relationship existed between stock broker/investment advisor and client, elderly client's gift of stock to advisor for no consideration reflected exercise of undue influence).

This Court has suggested that "common-law concepts including duress, lack of capacity, fraud, and undue influence, along with the parties' relative bargaining power and knowledge regarding the meaning and effect of the agreement, could bear upon the ultimate

19

determination of voluntariness." *Sheshunoff*, 172 S.W.3d at 695-96 (citing *In re Marriage of Bonds*, 5 P.3d 815, 824 (Cal. 2000) ("[T]he question is viewed as one involving such ordinary contract defenses as fraud, undue influence, or duress, along with some examination of the parties' knowledge of the rights being waived, or at least knowledge of the intent of the agreement.")). Thus, any exercise of undue influence by John in his capacity as a fiduciary bears directly on our determination of whether there is sufficient evidence to support the trial court's finding that Sharon did not execute the agreement voluntarily. As a result, we will first review the evidence of any undue influence exercised by John before addressing the parties' relative bargaining power and whether Sharon had adequate knowledge of the meaning and effect of the agreement. *See id.*; *see also Martin*, 287 S.W.3d at 263 (observing that voluntariness "is a question of fact dependent upon all the circumstances and the mental effect on the party claiming involuntary execution").

"In deciding whether there has been undue influence, the court should consider three factors: (1) the existence and exertion of an influence; (2) whether the influence operated to subvert or overpower the person's mind when executing the document; and (3) whether the person would have executed the document but for the influence." *Wils v. Robinson*, 934 S.W.2d 774, 780 (Tex. App.—Houston [14th Dist.] 1996), *writ granted, judgm't vacated w.r.m.*, 938 S.W.2d 717 (Tex. 1997). In this case, Sharon testified that she did not want to sign the marital property agreement, ultimately signing it only in response to John's insistence that she had to do so in order to save the marriage and his representations that it was necessary to secure her investment. During the time John was acting as a fiduciary in connection with the investment of Sharon's funds, he threatened to dissolve the marriage unless she signed an agreement that divested her of that

20

investment in a manner that provided him with a substantial financial benefit. This type of arrangement, in which the fiduciary greatly benefits to the detriment of the principal, clearly suggests the existence and exertion of an influence. *See Pace*, 574 S.W.2d at 796.

The testimony of both Sharon and Brown supports the notion that John's influence operated to overpower Sharon's mind when executing the document and that she would not have executed it but for the influence. *See Wils*, 934 S.W.2d at 780. Brown testified that when Sharon came to her office, she was in a state of great mental distress over John's insistence that she sign the agreement, crying and repeating, "You don't understand, I just have to sign this." Brown explained that she advised Sharon not to sign the agreement and asked her why she would sign an agreement that appeared to favor John, and Sharon responded, "You don't understand, I have to sign it to make the pressure stop at home." As previously noted, Sharon also testified that she did not want to sign the agreement, and that she only did because of John's pressure and influence.

Sharon explained in her testimony that she feared the loss of her entire $80,000 investment in Federalist, and that John assured her that she could get the money back if she would just sign the agreement. She further testified that she did not understand the sales provision of the agreement, stating, "[W]hat I didn't understand was how Federalist[] Investments worked, about the shares and my ownership in that and in exchange for paying me back the money. I didn't really understand all of that as well as everything that was his earnings and my earnings." This testimony supports the trial court's finding that John, while acting as a fiduciary, led Sharon to believe that she had to sign the agreement in order to protect her $80,000 in invested funds, despite the fact that Federalist had over $300,000 in equity in the South Mays property at the time and was collecting

21

$5,000 in rent from tenants each month. It further suggests that in pressuring her to sign the agreement out of fear of losing her $80,000 investment, John failed to disclose to Sharon that the agreement actually divested her of the substantial gain that had already materialized from that investment. These actions surpass mere persuasion or entreaty, reaching the level of undue influence. *See Neal v. Texas Dep't of Human Servs.*, 814 S.W.2d 216, 221-22 (Tex. App.—San Antonio 1991, writ denied) (holding that while "the law . . . does not condemn all persuasion, entreaty, cajolery, importunity, intercession, argument, and solicitation," undue influence occurred—and agreement was signed involuntarily—in light of actions that "cannot rightfully be considered a type of persuasion, entreaty, cajolery, or the like").

The evidence also supports a finding that Sharon lacked meaningful bargaining power. The agreement was drafted by an attorney in John's law firm, at John's direction. Sharon, after seeking advice from one attorney who refused to sign the agreement, took the agreement to Brown and explained that because of the pressure from John, she would have to sign the agreement regardless of its contents. Brown testified that Sharon showed up at her office with no appointment, that Brown was unable to evaluate the conscionability of the agreement because she had very little knowledge of the value of the property at issue, and that she advised Sharon not to sign the agreement. Despite her reservations, Brown ultimately signed the agreement as Sharon's counsel, noting that Sharon was extremely upset and insistent that she had to have an attorney's signature in order to satisfy John's demands. Brown did not attempt to negotiate any aspects of the agreement

22

on Sharon's behalf, nor did she charge Sharon for her time reviewing the agreement.[14] Thus, Sharon did not have the advantage of meaningful representation by counsel at the time the agreement was signed.

In addition, as previously discussed, Sharon testified that she did not understand the meaning or effect of the agreement, stating, "[W]hat I didn't understand was how Federalist[] Investments worked, about the shares and my ownership in that and in exchange for paying me back the money. I didn't really understand all of that as well as everything that was his earnings and my earnings." Sharon's testimony that she did not understand the meaning or effect of the agreement is supported by Heselmeyer's testimony at the enforceability hearing that Sharon lacked the basic financial knowledge needed to run rudimentary accounting software. Specifically, Heselmeyer stated that in 2003, Sharon had briefly attempted to manage the financial books and records for John's law firm, but that she was unable to do so because she did not "have the knowledge base to do that." When asked, "[S]he didn't have the computer skills or the financial skills to get in there and run even something as rudimentary as Quickbooks?" Heselmeyer answered, "I would agree with that."[15]

Sharon was also unaware of the value of John's law practice, preventing her from fully understanding the effect of the agreement's provision confirming it as John's separate property. By John's own testimony at the enforceability hearing, he did not provide Sharon with any documents reflecting the value of his law practice or any of the properties at issue in the post-marital

_____

[14] Sharon testified that she did make a request that two pieces of furniture be classified in the agreement as her separate property, stating, "I didn't totally understand the whole thing, but, yes, I did make that change."

[15] Heselmeyer testified that he did not recall Sharon ever reviewing the firm's financial information after 2003.

property agreement at the time the document was executed, nor did he provide any such documents to Brown, the attorney signing the agreement on Sharon's behalf. Sharon testified that she received no financial documents of any kind in connection with the agreement, and that she attempted to ask both John and Heselmeyer about the substance of the agreement, but received no answers.[16] When asked about the questions she sought to have answered, Sharon stated, "About the property, what did it entail; when I would sign it; just to go over it with me in detail, and neither one of them ever did." Sharon acknowledged that she had signed the family's income tax returns and had access to their personal bank accounts, but maintained that she did not have access to John's law firm accounts or financial records. John, on the other hand, asserted that Sharon had online access to the firm's bank accounts and could have accessed the firm's records at any time through his computer. The trial court was free to disbelieve John's testimony, but even assuming Sharon was able to access the firm's books and records, Heselmeyer's testimony suggests that she did not have the requisite financial and computer literacy to obtain financial information in this manner. Furthermore, any computer access Sharon might have had would not have yielded information regarding the potential value of any contingency-fee cases in the pipeline at the time the agreement was executed. This information, while highly relevant to the firm's value, could not be ascertained from a review of the law firm's bank statements. The value of a law firm that frequently operates on a contingency-fee basis is not readily apparent to a layperson, often requiring the opinions of an expert witness to establish. *See, e.g.*, *Von Hohn v. Von Hohn*, 260 S.W.3d 631, 637-38 (Tex. App.—Tyler 2008,

---

[16] Both John and Heselmeyer testified that Sharon had no questions about the agreement that went unanswered. The trial court, as finder of fact, was free to resolve this conflicting testimony and appears to have done so in Sharon's favor.

24

no pet.) (approving expert testimony in divorce case regarding value of contingency-fee practice, including value of potential settlements); *Fountain v. Knebel*, 45 S.W.3d 736, 740 (Tex. App.—Dallas 2001, no pet.) (determining harmful error occurred when wife's expert lacked sufficient information to render opinion on value of husband's law firm and wife was prevented from conducting additional discovery). Based on the foregoing, we consider the evidence sufficient to support a finding that Sharon did not understand the meaning or effect of the agreement at the time it was executed.

Given the evidence of John's breach of a fiduciary duty, the existence of undue influence, Sharon's lack of bargaining power, and her inadequate understanding of the meaning and effect of the agreement, we hold that the totality of the circumstances provides sufficient evidence to uphold the trial court's finding that Sharon did not sign the agreement voluntarily. *See Sheshunoff*, 172 S.W.3d at 696-97 (observing that "undue influence, along with the parties' relative bargaining power and knowledge regarding the meaning and effect of the agreement, could bear upon the ultimate determination of voluntariness"); *Vela v. Marywood*, 17 S.W.3d 750, 762 (Tex. App.—Austin 2000, pet. denied) ("Although the face of the affidavit reflects it was signed knowingly and voluntarily, we must consider the surrounding circumstances to determine if [appellant]'s signature on the document was procured by misrepresentation, fraud, or the like."); *see also Martin*, 287 S.W.3d at 264-65 (holding that fact issue existed on voluntariness where husband provided no financial disclosures related to businesses subject to property agreement and pressured wife to sign agreement by claiming that "family would be financially ruined" without it).

Because the trial court's order invalidating the marital property agreement may be upheld solely on the basis of involuntariness, we need not also address the issue of whether the agreement was unconscionable when signed. *See* Tex. Fam. Code Ann. § 4.105; *see also* Tex. R. App. P. 47.1 (courts of appeals must hand down opinions that are as brief as possible, addressing those issues necessary to final disposition on appeal).

*Applicability of Section 4.105*

Sharon takes the position on appeal that section 4.105 of the family code does not apply to the portion of the post-marital agreement governing the sale of Federalist because section 4.105 governs only "partition and exchange agreements" converting community property into separate property, and does not allow for agreements to convert one spouse's separate property into the other spouse's separate property. *See* Tex. Fam. Code Ann. § 4.105 (governing enforcement of "partition and exchange agreement"); *see also id.* § 4.102 (allowing spouses to "partition and exchange between themselves all or part of their community property" so that it becomes the separate property of the transferee). Sharon argues that all common law remedies and defenses, which are not available to a spouse challenging enforcement of an agreement under section 4.105, are available to her in connection with the agreement to sell her interest in Federalist. *See id.* § 4.105(c) ("The remedies and defenses in this section are the exclusive remedies or defenses, including common law remedies or defenses."). Based on our conclusion that Sharon has established the statutory affirmative defense of involuntariness under section 4.105, we need not further address whether common law remedies or defenses are available to her. Even if section 4.105 does not apply to the sale provision of the marital agreement, the evidence is sufficient to

26

support a finding that Sharon did not sign the agreement voluntarily, rendering it unenforceable under common law. *See Southwestern Underground Supply & Envtl. Servs. v. Amerivac, Inc.*, 894 S.W.2d 15, 18 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("Since lack of voluntariness would negate mutual assent, a necessary predicate to the formation of a contract, it would also negate the underlying contract.").

We affirm the trial court's order sustaining Sharon's challenge to the enforceability of the post-marital property agreement, and overrule John's issues on appeal in connection with this order.

## II. Divorce Decree

John argues that even if we affirm the trial court's order finding the post-marital property agreement unenforceable, the divorce decree should be reversed because the trial court abused its discretion in dividing the parties' community property.

In a decree of divorce, the trial court "shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party." Tex. Fam. Code Ann. § 7.001 (West 2006). In making the "just and right" division of community property, the trial court is vested with broad discretion. *Murff*, 615 S.W.2d at 698. The marital estate need not be equally divided, and the court may consider factors such as the disparity in the earning capacities of the parties. *Id.* at 699.

Under the final decree of divorce, the community property awarded to John included his law practice with an estimated value of $500,000, a motor vehicle with an estimated value of $12,785, and the bank accounts and personal property subject to his sole control, with an estimated

value of $10,000. Sharon was awarded her counseling business with an estimated value of $7,500, a motor vehicle with negative value, the Gabriels Overlook lots with an estimated value of $106,041.96, and bank accounts and personal property subject to her sole control, with an estimated value of $3,000. Based on these estimated values, John was awarded community property worth approximately $522,785, and Sharon was awarded community property worth approximately $116,542.

While the community property awarded to John exceeded the value of the community property awarded to Sharon by over 400%, John contends that the community property division was inequitable and unjust because the trial court overvalued his law practice. According to John, the firm was worth approximately $6,000 at the time of the divorce, rather than the $500,000 amount found by the trial court. John does not take issue with the estimated values assigned to the remaining items of community property, arguing only that the law firm value was highly inflated.

The trial court based its valuation of the firm, at least in part, on the fact that in negotiating with Heselmeyer for the sale of a 45% interest in December 2006, John estimated that the practice had a value of approximately $778,000. John testified at the divorce hearing, however, that he had overvalued the firm in negotiating with Heselmeyer, and that the firm had dramatically decreased in value since December 2006 because Heselmeyer had left the firm, taking a number of staff members and cases with him. He also testified that he had recently suffered from a number of health problems which prevented him from working and further diminished the value of the firm. On cross-examination, John testified that he placed no value whatsoever on any cases currently in progress at the firm, so that his accounts receivable had a current value of $0. He then revealed that

28

he had recently taken on eight contingency-fee cases, but took the position that he was taking on cases without assessing their potential value, so he had "no idea that anything is going to come of those." John testified that the law firm checking account contained $23,837.07, and that its trust account contained $149,724.11.[17] John also explained that the law firm paid no rent to Federalist for use of its office space, but that the firm "supplement[s] the shortfall" between the rent from other tenants and the full mortgage payment. John's testimony suggests that when the building is fully rented, the shortfall is approximately $800 a month.

Based on the foregoing, we cannot conclude that the trial court clearly abused its discretion in dividing the parties' community estate. *See Bell*, 513 S.W.2d at 22 (holding that in reviewing division of community property, "it must be presumed that the trial court exercised its discretion properly" and "a case should be reversed only where there is a clear abuse of discretion"). Even if the law firm's true value was as low as $100,000, far less than the $500,000 amount determined by the trial court, John still received a greater share of the community estate than Sharon. The fact that the firm's trust account contained $149,724 at the time of trial, a substantial portion of which represented retainers for ongoing cases, suggests that the firm did not have a nominal value of $6,000, as John contends. The trial court, as finder of fact, was free to disbelieve John's testimony that the cases currently pending at the firm had no value whatsoever. Finally, even if

---

[17] John testified that the firm's trust account reflected amounts on retainer, stating, "That is money sitting there for work to be done." When asked, "By and large that's . . . money that people have paid you that's on retainer, like for a family law case; is that correct?" John answered, "That's what it is, period. Those are just retainers that are in there for work to be done." While he later testified that his trust account also held funds for clients in situations involving sales of real property, he did not know how much of the $149,724 could be attributed to sales of real property because he does not "pay attention to any of these numbers."

Sharon *had* received a greater share of community property, the division need not be equal in order to be equitable. *See id.* In dividing the marital estate, the trial court has discretion to consider factors such as a disparity in the earning capacities of the parties, a factor that in this case would support an award of a larger portion of the marital estate to Sharon. *See Murff*, 615 S.W.2d at 698. Therefore, we hold that the trial court did not clearly abuse its discretion in dividing the community estate. John's points of error relating to the trial court's division of community property are overruled.

## CONCLUSION

We affirm both the trial court's order finding the marital property agreement unenforceable and the final decree of divorce.

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: May 14, 2010